Thomas A. HARRIS, M.D. and Amy Harris, Plaintiffs,

v.

Larry TOMCZAK, etc., et al., Defendants.

Civ. No. S–80–206 LKK.

United States District Court, E. D. California.

July 12, 1982.

Richard G. Gay, Washington, D. C., Weldon Reeves, Sacramento, Cal., for defendants Tomczak and Tag Ministries.

Gary Nevers, Hodge & Skoog, Inc., Los Angeles, Cal., for plaintiffs.

F. Michael Ford, Tuscaloosa, Ala., Walter Gallawa, Sacramento, Cal., for defendant Robert Mumford.

James Clymer, Lancaster, Pa., Don E. Bennett, Lodi, Cal., for defendant Harry Rutt.

Michael B. Moore, Cartwright, Sucherman, Slobodin & Fowler, Inc., San Francisco, Cal., for defendant Jimmy Moore.

## OPINION AND ORDER

KARLTON, District Judge.

Plaintiffs, Dr. Thomas Harris and his wife Amy Harris, authors of "I'm Okay—You're Okay," brought this defamation action seeking damages from defendant Tomczak and others. The defendants have brought on a variety of motions. This published opinion will be restricted to considering defendant Tomczak's motion for partial summary judgment requesting that this court find that the plaintiffs are "public figures." [1] The effect of such a holding, of course, would be to require plaintiffs to prove "constitutional malice" in order to prevail. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).[2]

I

## CHOICE OF LAW

■ Plaintiffs have brought this action predicating jurisdiction upon diversity of citizenship, 28 U.S.C. § 1332. Accordingly, this court must apply the California law of defamation. *Erie RR v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Nonetheless, by virtue of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny "[t]he time is long since past when cases such as this could be treated independent of First Amendment standards." *Lewis v. Time, Inc.*, 83 F.R.D. 455, 461 n.5 (E.D.Cal.1979), *appeal docketed* (9th Cir. Jan. 14, 1982). As Justice White explained, the cumulative effect of the Supreme Court cases considering the effect of the first amendment on the law of defamation has been that "the Court

---

1. The other motions will be disposed of in a companion unpublished opinion. The reasons for bifurcating this opinion are set forth in my opinion in *Kouba v. Allstate Insurance Co.*, 523 F.Supp. 148, 151 n.2 (E.D.Cal.1981), *appeal docketed* No. 81–4566 (9th Cir. Oct. 19, 1981).

2. The doctrine that in certain cases a plaintiff must prove that allegedly defamatory statements were expressed with knowledge of falsity or reckless disregard for the truth was first enunciated by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686 (1964) (public officials), and was quickly extended to "public figures." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 164–65, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967). The court described the requisite showing as "actual malice." The use of this term, connoting as it does, common law notions of hatred and ill will (*see* 4 Witkin,

*Summary of California Law*: Torts § 304 at 2575 (8th ed. 1974)), is most unfortunate (*see* W. Prosser, *The Law of Torts* at 821 (4th ed. 1971)), and in early cases led to confusion. *See Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967); *Meiners v. Moriarity*, 563 F.2d 343, 350–51 (7th Cir. 1977). For the balance of this Opinion and in order to distinguish the two, when referring to the common law meaning I shall use the term "common law" malice, while when referring to the constitutional doctrine, I shall use the term "constitutional" malice. This usage is consistent with the Ninth Circuit's description of the doctrine as one of "constitutional privilege." *See Arnheiter v. Random House Inc.*, 578 F.2d 804, 805 (9th Cir. 1978), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979).

... has federalized major aspects of libel law...." *Gertz v. Welch*, 418 U.S. 323, 370, 94 S.Ct. 2997, 3022, 41 L.Ed.2d 789 (1974) (White, J. dissenting). In sum, although "the states ... retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood ..." (*Gertz v. Welch*, 418 U.S. at 345–46, 94 S.Ct. at 3009–3010) the boundaries of that power are defined by the Federal Constitution. Accordingly, no state may impose liability for a defamatory statement the subject of which is a "public official" or "public figure" unless the plaintiff proves that it was made with knowing falsehood or reckless disregard of the truth. *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–726 (public official); *Curtis Publishing Co. v. Butts*, 388 U.S. at 155, 164–65, 87 S.Ct. at 1991, 1996 (public figure). Since no claim is made in this case that plaintiffs are public officials, the ultimate task here is to ascertain the definition of a public figure for purposes of defamation cases[3] and to determine whether the record before the court permits resolution of the plaintiffs' status on summary judgment.

Prior to addressing this task, however, certain preliminary legal matters must be considered. Accordingly, a consideration of the facts will be deferred to a later portion of this Opinion (*see* Part IV, *infra*). The first of these legal issues is the role of the court and the jury in determining who is a public figure.

## II

### QUESTIONS OF LAW, QUESTIONS OF FACT AND MATTERS FOR SUMMARY JUDGMENT

As I have noted, defendant seeks the application of the doctrine of constitutional privilege[4] which is dependent upon whether the plaintiffs, or either of them, are public figures. Defendant's selected procedural device for seeking pretrial disposition of this issue is a motion for partial summary judgment. Fed.R.Civ.P. 56.

Ordinarily, of course, the question tendered on a motion for partial summary judgment is whether it has been demonstrated that there is no genuine issue of dispute as to any material fact and that the moving party is entitled to the judgment sought as a matter of law. *See Avila v. Travelers Insurance Co.*, 651 F.2d 658, 660 (9th Cir. 1981); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980). Accordingly, "the court's task is the discovery of material disputes of fact, not their resolution." *Kouba v. Allstate Insurance Co.*, 523 F.Supp. 148, 154 (E.D.Cal. 1981), *appeal docketed* No. 81–4566 (9th Cir. Oct. 19, 1981). A material issue of fact, of course, "is one that makes a difference in the litigation." *Kouba v. Allstate Insurance Co.*, 523 F.Supp. at 154; *see also Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979); *Beltz Travel Service Inc. v. International Air Transport Association*, 620 F.2d 1360, 1364 (9th Cir. 1980). The first step, then, in resolution of such a motion is for the court to "identify material facts" and to do so it "must turn to the substantive law." *Kouba v. Allstate Insurance Co.*, 523 F.Supp. at 154. This case, however, presents a variation of the ordinary procedures. Said variation is necessary since, as I will explain

---

3. Although the issue of who is a public figure is initially a matter of constitutional minima and thus a federal question, there appears to be no impediment to a state according greater protection to free speech by broadening the definition of a public figure, *see* Restatement, Second, Torts § 580A, Comment (e) at p. 219 (1977), or indeed broadening the scope of speech protected, *see AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976)

(rejecting the public figure standard in favor of the "public interest" or "public controversy" test posited by the plurality in *Rosenbloom v. Metromedia Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)).

4. A privilege is an excusing condition. "One who otherwise would be liable for a tort is not liable if he acts in pursuance of and within the limits of a privilege...." Restatement, Second, Torts § 890 at p. 355.

below, plaintiffs' status as public or private figures has been held to be a question of law to be resolved by the court rather than a question of fact to be resolved by the jury.[5]

The classification of the problem of public figures as one of law was first announced by the Supreme Court shortly after the decision in *New York Times* itself. Justice Brennan almost offhandedly observed "We remark only that, as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.' " *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966).[6] Although the Supreme Court has not explicitly discussed the problem since *Rosenblatt*, it is certainly true that the Court has treated the issue of public figure status as a matter of law. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450

(1979); *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). In these two cases the district court resolved the question of whether the plaintiff was a public figure in the context of motions for summary judgment. *See Hutchinson v. Proxmire*, 431 F.Supp. 1311, 1326 (W.D.Wis.1977); *Wolston v. Reader's Digest Ass'n, Inc.*, 429 F.Supp. 167, 176, n.30 (D.D.C.1977). In this judgment they were joined by the courts of appeals. *Wolston v. Reader's Digest Ass'n, Inc.*, 578 F.2d 427 (D.C.Cir.1978); *Hutchinson v. Proxmire*, 579 F.2d 1027 (7th Cir. 1978). In both cases the Supreme Court reversed.

In doing so, the Court did not suggest that there were contested issues of fact nor that there being no contested issues of fact only one conclusion was possible. Rather, the Court found that the plaintiffs simply were not public figures. This treatment can only be understood as the Court review-

5. This court has recently considered the persistent and perplexing problem of distinguishing between issues of law and fact in another context. *See Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F.Supp. 940, 943 n.3 and n.4, (E.D.Cal.1981). I observed there that "Law traditionally is viewed as society's judgment as to competing values and thus a way of meaningfully ordering events in the physical universe. Facts, on the other hand, are instances in the physical universe about which judgments are made." 525 F.Supp. at 943–44, n.4. *See also* I Wigmore on Evidence, § 1 at p.2 (3d ed. 1940). Under this analysis I found that the classification of the issue of "patentability" as one of law not particularly troublesome since it is a conclusion that a product is worthy of the law's protection, whatever its commercial value. I did, however, express my concern with the classification of the "obviousness" of a particular design as a question of law inasmuch as said determination requires a subjective judgment regarding events in the physical universe. Thus, the determination of whether a given design was "obvious" appeared to me to be a factual determination in that it involved a process of sifting evidence. 525 F.Supp. at 943–44, n.4. Nonetheless, as in that case, I do not now write upon a clean slate and thus my own conclusion as to the proper characterization of the public figure question as one of law or fact may be beside the point.

6. Justice Brennan did not explain why such a classification was appropriate. Applying the analytical mode that I employed in *Famolare Inc. v. Edison Bros. Stores, Inc.*, 525 F.Supp.

940, (*i.e.* that questions of law consist of the application of value judgments as ordering principles to particular events), it seems relatively clear that the existence of a "privilege" may well be reasonably classified as a question of law. That is, upon determining that the speech is "privileged," it enjoys protection which it would not otherwise have, in the same fashion that a product, once it is determined to be patentable, gains protection which it would not otherwise enjoy. *See* 525 F.Supp. at 942–43 and n.1, 3. Nonetheless, the issue of whether certain speech is "privileged" (like whether a product is patentable) turns upon the facts underlying the particular case in question. As I will explain in the body of this Opinion, the resolution of such a factual predicate is ordinarily left to the jury as the trier of fact. Indeed, even if the ultimate determination of whether one is a public figure is properly characterized as a question of law, it appears to this court that the means of reaching that determination are mired in the same law/fact confusion as the determination of "obviousness" is in the patent law. In both instances the courts have confused the process of ascertaining the historical facts with the process of applying legal principles to the ascertained facts. As in *Famolare Inc. v. Edison Bros. Stores, Inc.*, however, I am bound by the rulings of the higher courts on the issue. In the following portion of this Opinion I will attempt to discover the holdings of the higher courts which pertain to this case.

ing the issue as one of law. Moreover, the resolution of the question of "public figure" status on summary judgment failed to elicit any comments by the Supreme Court on its review. The Court's silence in this regard must be contrasted with the Court's suggestion that the question of whether defendants acted with constitutional malice would not appear to be amenable to disposition on summary judgment because of the complex factual issues which underlie that question. *Hutchinson v. Proxmire*, 443 U.S. at 120 n.9, 99 S.Ct. at 2680 n.9.[7]

*Rosenblatt's* characterization of the public official question as one for the court, has been extended to public figures, repeatedly recognized, and indeed has become a commonplace feature of libel law. *See e.g., Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293, n.12 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 8 (1980); *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238, 1247 (5th Cir. 1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981); *Virgil v. Time, Inc.*, 527 F.2d 1122, 1130, n.13 (9th Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976); *Velle Transcendental Research Ass'n., Inc., v. Sanders*, 518 F.Supp. 512, 515 (C.D.Cal. 1981); *Hoffman v. Washington Post Co.*, 433 F.Supp. 600, 604 (D.D.C.1977), *aff'd*, 578 F.2d 442 (D.C.Cir.1978); *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 444 (S.D.Ga.1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978); *Hotchner v. Castillo-Puche*, 404 F.Supp. 1041, 1045 (S.D.N.Y.1975). The same rule is followed in California. *Weingarten v. Block*, 102 Cal.App.3d 129, 134,

162 Cal.Rptr. 701 (1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 128 (1980).

Classification of the public figure issue as one of law raises complex and difficult questions. In particular, this formulation invites inquiry as to the role contested issues of fact play in determining whether a particular plaintiff is a "public" or "private" figure. In the context of this motion, an accurate way of posing the question is whether, by virtue of the classification of the issue of "public figure" as a legal question, the traditional role of the court on summary judgment has been modified? To be frank, the cases are in profound disarray.[8]

As I have noted, in *Rosenblatt* the Supreme Court taught that the question of whether a plaintiff is a public official is one of law. Because of the nature of the definition of a public official, however, it is unlikely that there will arise disputed issues of fact material to the ultimate determination. This has led one court to observe that "[i]n most cases it is a relatively simple matter to determine whether the plaintiff is a public official . . . ." *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 588 (5th Cir. 1967), *cert. denied*, 393 U.S. 825, 89 S.Ct. 88, 21 L.Ed.2d 96 (1968). Thus, the question raised above regarding the role which contested issues of fact play in the ultimate determination may not arise in cases where "public officialdom" is at issue. The question may become acute, however, when the plaintiff is asserted to be a public figure, since "there is substantially more room for the interplay of facts . . ." where the latter classification is the issue. *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d at

---

7. While such a close reading of Supreme Court cases may be no more useful than the examination of the entrails of a sacrificed animal in Greek times, the contrast exists and may throw some light on whether there is a distinction between the appropriate treatment on summary judgment of the issues of constitutional malice and public figures.

8. In determining this question I look to the federal cases. Under California law the public figure question is to be determined by the trial court prior to the commencement of the jury trial. *Weingarten v. Block*, 102 Cal.App.3d 129, 134–35, 162 Cal.Rptr. 701 (1980). Despite the fact this is a diversity case, however, California law is not determinative. *See Byrd v. Blueridge Rural Electrical Cooperative, Inc.*, 356 U.S. 525, 537–38, 78 S.Ct. 893, 900–901, 2 L.Ed.2d 953 (1958). (Allocation of tasks between judge and jury are questions of federal, not state law).

588. In what appears to be the first case to consider the effect of *Rosenblatt's* classification, the district court in question perceived that its task in considering a motion for summary judgment on the public figure issue had been changed and that under *Rosenblatt* it was required to weigh the evidence tendered in ruling on the motion. *See Hotchner v. Castillo-Puche,* 404 F.Supp. at 1045–47. Although this perception has been frequently alluded to in subsequent cases, as I will now point out, the appropriate role of disputed issues of fact in resolving the public figure issue remains unsettled.

A surprising number of courts, while recognizing the applicability of the *Rosenblatt* classification to the public figure issue, have found that in the case before them there were no material facts in dispute as to that issue and thus have not been required to consider the effect of the classification upon the role which contested issues of material fact play in the context of a motion for summary judgment. *See, e.g., Fitzgerald v. Penthouse International Ltd.,* 525 F.Supp. 585 (D.Md.1981); *Velle Transcendental Research Ass'n Inc. v. Sanders,* 518 F.Supp. 512; *Hoffman v. Washington Post Co.,* 433 F.Supp. 600; *Hutchinson v. Proxmire,* 431 F.Supp. 1311; *Wolston v. Reader's Digest Ass'n, Inc.* 429 F.Supp. 167; *Trans World Accounts Inc. v. Associated Press,* 425 F.Supp. 814 (N.D.Cal.1977).

In two recent cases the Fifth Circuit has directly addressed the issue. That circuit has held that the matter of whether a plaintiff is a public figure must be resolved by the court and that submission of the issue to the jury by way of special interrogatories is reversible error. *Brewer v. Memphis Publishing Co., Inc.,* 626 F.2d at 1247. Nonetheless, the circuit has also held that the issue may be resolved on summary judgment only if there is no dispute as to the material facts. *Rebozo v. Washington Post Co.,* 637 F.2d at 379. Thus in the Fifth Circuit, if there is a dispute as to material

facts, the dispute must be resolved by the court, but only after an "evidentiary hearing." *Rebozo v. Washington Post Co.,* 637 F.2d at 379.[9]

The Fifth Circuit has not explained whether the "evidentiary hearing" following which the court is to resolve the public figure issue is the trial or some separate proceeding.

In the District of Columbia Circuit a different procedure is apparently employed. There the court of appeals views the issue as one "analogous to a court's ruling on the question of probable cause for a search and seizure, a matter which of course is for the court and not the jury." *Wolston v. Reader's Digest Ass'n Inc.,* 578 F.2d 427, 429 (D.C.Cir.1978), *reversed on other grounds, Wolston v. Reader's Digest Ass'n Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). In the face of an appellant's claim that the issue of whether a plaintiff is a public figure is a "complex factual question . . . properly a jury matter," the court observed that appellant was "unable to cite any case in which a jury has been permitted to decide whether a plaintiff, as a matter of 'constitutional fact,' is a public figure." 578 F.2d at 429. Moreover, in the District of Columbia Circuit it appears that the court is to weigh and evaluate the evidence. In a recent case reviewing the granting of summary judgment, that court of appeals held that "[i]n undertaking this examination, a court must look through the eyes of a reasonable person at the facts taken as a whole." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d at 1292. Is the analogy to search and seizure suggestive that in response to a summary judgment motion a pretrial hearing and disposition with the court weighing the evidence is required? The answer may be that such is the suggestion, but in the Third Circuit, in any event, such is not the answer.

*Gordon v. Random House Inc.,* 486 F.2d 1356 (3d Cir. 1973), *vacated and remanded,*

---

9. It is interesting, nonetheless, that in both of those cases the appellate court, having resorted to the "undisputed portions of the evidence" (*Brewer v. Memphis Publishing Co., Inc.,* 626 F.2d 1238, 1247 (5th Cir. 1980)) and the "undisputed facts" (*Rebozo v. Washington Post Co.,* 637 F.2d 375, 379 (5th Cir. 1981)) found each plaintiff to be a public figure.

419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974) (for consideration in light of *Gertz*), represents the Third Circuit's attempt to traverse this doctrinal muck. There the trial court was confronted with an analogous issue of whether under the *Rosenbloom v. Metromedia Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) plurality opinion, the subject matter of the speech charged as libel concerned "an issue of public or general concern." 403 U.S. at 44, 91 S.Ct. at 1820. The trial court applied the conventional summary judgment standard (*see Gordon v. Random House Inc.*, 349 F.Supp. 919, 924–25 (E.D.Pa.1972)). Nonetheless, the court of appeals reversed and remanded "for the development of a complete record at trial." 486 F.2d at 1357. Although the district court was reversed so that a complete record could be developed at trial, the appeals court recognized that the question was one for the trial court and not the jury. 486 F.2d at 1361–62.[10] In so holding the court relied on a previous decision of the circuit where in an analogous situation it was held that "[j]ust as disputed facts in a non-jury case are determined by trial and not on summary judgment motion, a trial judge's decision to instruct the jury with the New York Times standard . . . . [is] made after a full trial on the contested factual issues." *Taggart v. Wadleigh-Maurice Ltd.*, 489 F.2d 434, 439 (3d Cir. 1973), *cert. denied*, 417 U.S. 937, 94 S.Ct. 2653, 41 L.Ed.2d 241 (1974).[11]

Thus, three lines of decision appear to have emerged from the federal courts. In one line of opinions the court's duty on summary judgment has changed (*Hotchner v. Castillo-Puche*, 404 F.Supp. 1041; *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287); the two other lines of opinion require application of conventional summary

judgment standards but require the court to resolve the situation either at an evidentiary hearing (*Rebozo v. Washington Post Co.*, 637 F.2d 375), or at trial (*Gordon v. Random House, Inc.*, 486 F.2d 1356).

Insofar as this court can tell, the Ninth Circuit has apparently not yet addressed the question. In an obscure piece of dicta, the court in discussing whether the issue of constitutional malice was a jury question observed that "*Rosenblatt v. Baer* [citation omitted] deals with privilege—whether the evidence shows the plaintiff to be a public official. It says nothing about how the trial judge is to view the evidence in making that determination." *Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael*, 492 F.2d 438, 442 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). Nonetheless, subsequent dicta recognizes that the public figure issue is one for the court and not the jury. *Virgil v. Time, Inc.*, 527 F.2d 1122, 1130 n.13 (9th Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976). Neither case provides guidance as to the procedure I am to employ.

This state of utter disarray appears wholly unwarranted. Justice Brennan in writing *Rosenblatt* cited to three sources in support of his observation that the public official issue was one for the court "in the first instance": Harper and James, *Torts* § 5.29 (1956); Prosser, Torts § 110, p. 823 (3d ed. 1964); Restatement, Torts § 619. 383 U.S. at 88, n.15, 86 S.Ct. at 677, n.15. The court explained that the purpose of limiting the issue to the judge in the first instance was to "[l]essen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court the record

---

**10.** Unfortunately the court of appeals was not particularly helpful in guiding the district court as to when and how the decision should be made. It merely observed "[w]e do not indicate at what stage of the litigation this ruling must be made, other than to require that '[t]he court shall inform counsel of its proposed action . . . prior to . . . arguments to the jury . . .' Fed.R.Civ.P. 51." *Gordon v. Random House, Inc.*, 486 F.2d 1356, 1362 n.8 (3d Cir. 1973).

**11.** In the Ninth Circuit it is unclear whether the issue of public or general interest (as contrasted with public figures) is one for the court or the jury. *See and compare Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976) with *United Medical Laboratories, Inc., v. Columbia Broadcasting System, Inc.*, 404 F.2d 706, 711–12 (9th Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

and findings required for review of constitutional decisions." 383 U.S. at 88, n.15, 86 S.Ct. at 677, n.15. As to the latter matter, the court cited two specific cases: *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958) and *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964). An examination of each of these sources clearly demonstrates that no confusion is warranted.

The Restatement, Second, of the Law of Torts explains the issue and the process to be applied for its resolution simply and clearly. "The court determines whether the occasion upon which the defendant publishes the defamatory matter gives rise to a privilege." Restatement, Second, Torts § 619 at p. 316 (1977). In the comment following that section the Restatement explains "Whether a privilege exists at all is a question for the court. This requires the court to determine whether the circumstances under which the publication was made were such as . . . to make the publication privileged. . . . If the facts are in dispute, the jury is called upon to consider the evidence and pass upon the issues thus raised. It is for the court, however, to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged." *Id.* § 619 comment (a) at p. 316.

Concerning the precise issue addressed here, the Restatement opines that "[t]he question of whether a plaintiff is a public official or a public figure . . . is one of law, not of fact, though the facts on which the determination is to be made may be in dispute and therefore subject to the determination of the fact finder." *Id.* at § 580a, comment (c) p. 217. Examination of Professor Prosser's treatise also demonstrates that the confusion need never have arisen. As Prosser explains, "[w]hether the occasion was a privileged one, is a question to be determined by the court as an issue of law, unless of course the facts are in dispute, in which case the jury will be instructed as to the proper rules to apply." Prosser, *supra* § 115 p. 796. Thus the texts cited by the

Supreme Court in support of the announced rule in no fashion suggests that the traditional role of the court and jury is in any way altered by the classification of the public figure privilege as one of law.

Moreover, an examination of the two cases cited by the court, *Speiser* and *New York Times Co.*, in support of the policy argument does not require a different result. Both cases are instances of what has come to be known as the "constitutional facts" doctrine. In such cases the Supreme Court has held that it is critically important that we distinguish "between speech unconditionally guaranteed and 'speech which may legitimately be regulated. . . .'" *Speiser v. Randall*, 357 U.S. at 525, 78 S.Ct. at 1341. In order to ensure that such a distinction is made each court must "'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.'" *New York Times Co. v. Sullivan*, 376 U.S. at 285, 84 S.Ct. at 728, *quoting Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946). This requirement is explicitly placed upon the court in terms of an independent examination of the record and extends to all forms of litigation involving application of first amendment principles including libel. *New York Times Co. v. Sullivan*, 376 U.S. at 285, 84 S.Ct. at 728; *Letter Carriers v. Austin*, 418 U.S. 264, 282, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1974). Nonetheless, the constitutional facts doctrine does not require any unusual pretrial activity on the court's part. On the contrary, it requires independent scrutiny of the entire record, a task that can only be accomplished after the trial. This court wishes to be clear. I have already observed that "[e]ven well established procedural rules must bow to First Amendment considerations." *Lewis v. Time, Inc.*, 83 F.R.D. at 461. Nonetheless, in all other contexts the doctrine of "constitutional facts" (i.e. independent review of the factual determinations of the jury be each court having the

matter properly before it), has been viewed as a sufficient protection of first amendment values.[12]

As I have noted, neither the Ninth Circuit nor the United States Supreme Court has directly addressed the issues discussed above. The role which contested issues of material fact play in resolution of a motion for summary judgment on the public figure status of a particular plaintiff remains unsettled. "Thus this court is free to consider the issue as one of first impression." *Hassan v. Delta Orthopedic Medical Group, Inc.*, 476 F.Supp. 1063, 1064 (E.D.Cal.1979).

It is my own conclusion that the courts have misconstrued *Rosenblatt*. If writing on a clear slate I have no doubt as to what I would do—I would follow the suggestions of the Restatement and Prosser and submit the contested facts to the jury for resolution. Despite the absence of binding authority, however, I clearly do not write on a clean slate. Too many courts have considered the subject and the result, if not the reasoning or the procedure, is simply too clear. Disputed questions of fact involving the "constitutional fact" issue of whether the plaintiff is a public figure, may not be submitted to the jury. *Rebozo v. Washington Post Co.*, 637 F.2d 375; *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238; *Wolston v. Reader's Digest Ass'n, Inc.*, 578 F.2d 427; *Gordon v. Random House, Inc.*, 486 F.2d 1356.[13]

On the other hand, it now seems clear that in resolving a motion for summary judgment on the public figure status of a particular plaintiff, conventional Rule 56 standards apply. *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. at 162, n.5, 99 S.Ct. at 2704, n.5 (conventional standards of appellate review apply); *Rebozo v. Washington Post Co.*, 637 F.2d at 376; *Woy v.*

*Turner*, 533 F.Supp. 102, 105 (N.D.Ga.1981); *Fitzgerald v. Penthouse International Ltd.*, 525 F.Supp. at 589; *Lerman v. Chuckleberry Publishing, Inc.*, 521 F.Supp. 228, 232 (S.D.N.Y.1981); *Velle Transcendental Research Ass'n. v. Sanders*, 518 F.Supp. at 515; *Trans World Accounts Inc. v. Associated Press*, 425 F.Supp. at 822. Accordingly, if there are any contested issues of material fact, the motion should be denied.

Having ascertained the role disputed material facts play in a motion for summary judgment relative to "public figures," I must now turn to the substantive law for a definition of a public figure. It is from that definition that one can determine what facts are "material" to the resolution of the public figure issue.

### III

### DEFINITION OF PUBLIC FIGURES

The late Dean Prosser once aptly observed:

It must be confessed at the beginning that there is a great deal of the law of defamation which makes no sense. It contains anomalies and absurdities for which no legal writer ever has had a kind word, . . . The explanation is in part one of historical accident and survival, in part one of the conflict of opposing ideas of policy in which our traditional notions of freedom of expression have collided violently with sympathy for the victim traduced and indignation of the maligning tongue.

W. Prosser, *The Law of Torts*, § 111 at p. 737 (4th ed. 1971). The history of our Supreme Court's effort to accommodate traditional notions of freedom of expression as embodied in the first amendment with sympathy for the victim's reputation as embod-

---

**12.** Of course the threat of litigation itself may have a chilling effect on the exercise of free speech (*New York Times Co. v. Sullivan*, 376 U.S. at 279, 84 S.Ct. at 725), and thus pretrial disposition, where possible, is desirable (*see Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969)). Nonetheless, such considerations have not generally been thought to

require modification of the constitutional facts doctrine.

**13.** Whether this issue should be resolved by an evidentiary hearing, *Rebozo v. Washington Post Co.*, 637 F.2d at 379, or by the court after a trial, *Gordon v. Random House, Inc.*, 486 F.2d at 1362 n.8, need not be resolved in this Opinion.

ied in the law of defamation has been repeatedly traced since *New York Times v. Sullivan.* This court will resist the temptation to retrace that history and simply cite interested counsel to appropriate sources. *See Gertz v. Welch*, 418 U.S. at 332–39, 94 S.Ct. at 3003–3006 (from *New York Times Co. v. Sullivan* through *Rosenbloom v. Metromedia, Inc.*); *Hutchinson v. Proxmire*, 443 U.S. at 133–34, 99 S.Ct. at 2687 (from *New York Times Co.* through *Gertz v. Welch*); *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d at 1249–57 (from *Gertz* through *Wolston v. Reader's Digest Ass'n, Inc.*); *Yiamouyiannis v. Consumers Union of United States, Inc.*, 619 F.2d 932, 937–38 (2d Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). Although retracing that history helps explain the present state of the law it does not provide the court with the appropriate resolution of the pending summary judgment motion, my immediate task. In order to resolve defendant's motion I must first arrive at a definition for what constitutes a public figure.

Central to the process of legal reasoning is the notion that it is possible to define and classify events and persons. Although the notion that definitions are possible has recently been challenged by modern linguistic philosophers, *see* Ludwig Wittgenstein, *Philosophical Investigations* (1953), the legal system presupposes that some form of definitional process is possible. Even if at some level of philosophic discourse this presupposition is in error, the notion is indispensible to the operation of the law. As a rational matter a system of law, as contrasted with a series of ad hoc judgments, requires standards. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1293. It is impossible to judge the propriety of imposing liability as a matter of law if the

trier of fact is unable to ascertain what standards are to be applied. By necessity, the distinction between events which give rise to liability and those which do not, requires the drawing of lines and implicitly, then, definitions.[14] As Justice Powell observed in the seminal case restricting the *New York Times* standard to public figures "[b]ecause an ad hoc resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general application." *Gertz v. Welch*, 418 U.S. at 343–44, 94 S.Ct. at 3008–3009.

As I will now attempt to show, a fundamental problem in the resolution of libel cases is the failure of the Supreme Court to provide an adequate definition of the term "public figure." As Judge Tamm so gently put it, "[u]nfortunately, the Supreme Court has not yet fleshed out the skeletal description of public figures and private persons enunciated in *Gertz*." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1292. *See also Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) ("the public figure concept has eluded a truly working definition").

In *Gertz*, the Court observed that:

For the most part those who attain this status [public figure] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

418 U.S. at 345, 94 S.Ct. at 3009.[15] In a recent case the Chief Justice characterized

---

**14.** For the purposes of this Opinion, I use the term definition in its traditional sense. " 'Definition' = 'statement that one term has the same designation as another term.' " Monroe C. Beardsley, *Practical Logic* at p. 162 (1950).

**15.** This observation echoes the first case which extended the *New York Times* standard to public figures. The court there observed that

"both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; ... Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy...." *Cur-*

the Court's observation in *Gertz* as "a general definition of 'public figures'." *Hutchinson v. Proxmire*, 443 U.S. at 134, 99 S.Ct. at 2687; *see also Time, Inc. v. Firestone*, 424 U.S. 448, 453, 96 S.Ct. 958, 964, 47 L.Ed.2d 154 (1976). Application of this so-called "definition," however, has been difficult and has led to wholly inconsistent results.[16]

The difficulty and inconsistency is not the result of the failure of the courts to apply the "definition" but, rather, abides in the "definition" itself. As shall appear, when treated as a definition, the quotation from *Gertz* violates various well recognized standards concerning the adequacy of a definition. As an example, the purported "definition" of public figure includes the term "public controversy" and thus violates the rule that a definition should not be circular.[17]

Secondly, the "definition" violates the standard that an adequate definition must use terms that are themselves clear and unambiguous.[18] Thus as an example the purported definition uses various uncertain terms such as "affair of society" (*see and compare Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 with, *e.g., Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238. Moreover, this standard for the adequacy of a definition generally precludes use of figures of speech which abound in the *Gertz* "definition" (e.g., "public figures

have thrust themselves to the forefront ...."[19] 418 U.S. at 345, 94 S.Ct. at 3009.

Finally, and perhaps most essentially, the "definition" does not appear to include all the essential characteristics of a public figure.[20] Thus in *Hutchinson* the Court taught that central to the so-called limited purpose public figure determination is the degree of public attention. The Court observed in that case that the plaintiff's activities did not invite the "degree of public attention and comment ... essential to meet the public figure level." 443 U.S. at 135, 99 S.Ct. at 2688. If the "degree of public attention" is indeed an "essential" element of the classification of one as a public figure, then its absence from the definition renders said definition insufficient. Similarly, *Wolston* teaches that in determining whether one is a public figure it is essential to "focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" 443 U.S. at 167, 99 S.Ct. at 2707. If this is an essential element, then the absence of such a focus in the definition is equally fatal to its utility.[21]

All of the deficiencies noted above militate against the classification of the quoted language in *Gertz* as a definition. Nonetheless, as a subordinate court I would be bound to apply the language as a definition had the Supreme Court held it to be such, whether or not the holding was "misguided." *See Hutto v. Davis*, —— U.S. ——,

tis *Publishing Co. v. Butts*, 388 U.S. at 154–55, 87 S.Ct. at 1991.

**16.** Thus in the *Hutchinson* case both the district court and the court of appeals found that the plaintiff was a public figure. The Supreme Court reversed. The same pattern appears in *Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). *See and compare Meeropol v. Nizer*, 381 F.Supp. 29 (S.D.N.Y.1974), *aff'd in relevant part* 560 F.2d 1061 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), *with Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450.

**17.** "The term being defined or a synonym of it should not appear in the definition." Daniel S. Robinson, *The Principles of Reasoning*: Introduction to Logic and Scientific Method, at p. 58 (3 ed. 1947).

**18.** "The definition *must not be obscure and confused.* Since accuracy, clearness and precision is the goal of definition every obscure and ambiguous definition defeats its own purpose." Robinson, *supra* at 57 (emphasis in original).

**19.** "Sometimes it [obscurity] is due to the use of figurative expressions, especially metaphores." Robinson, *supra* at 57.

**20.** "The basic rule is that the definition *must state all the essential attributes of the object which is being defined.*" Robinson, *supra* at p. 56 (emphasis in original).

**21.** It is of course true that the definition speaks of thrusting one's self before the public but that metaphore, while descriptive, hardly describes the necessary level of participation required.

——, 102 S.Ct. 703, 705, 70 L.Ed.2d 556, 561 (1982). Although the Court characterized the language as a "definition" in *Hutchinson* a review of subsequent cases indicates that said characterization does not represent the holding of the Court. In fact, in an opinion filed the same day as *Hutchinson* the Court quoted the exact language from *Gertz* and stated that it "identified two ways in which a person may become a public figure for purposes of the First Amendment." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. at 164, 99 S.Ct. at 2705. Of course the mechanism for becoming a public figure is something quite different from the definition of a public figure. Moreover, as I have noted above, various courts have concluded that the Supreme Court has not articulated a final and binding definition of "public figures."

Based upon the analysis set forth above, I conclude that binding authority is absent and that I must seek my own definition of a public figure. To aid in the formulation of that definition I will first turn to a variety of cases which I believe have attempted to define a public figure with unsatisfactory results.

Because the quoted language in *Gertz* is inadequate to serve as a definition, various courts have searched elsewhere in that Supreme Court opinion [22] for an aid in defining the term. Some courts have seized upon the various rationales for limiting the *New York Times* standards to "public figures," and have sought to make them the definition. Thus, among the rationales advanced by the *Gertz* Court was that public figures were not in as great need of protection from defamation because they had access to the media and, accordingly, self help was more available to public figures than to private persons. *See, generally,* 418 U.S. at 344, 94 S.Ct. at 3009.[23]

■ It appears to this court that perceiving "access to the press" as an element of the definition of a "public figure" is probably erroneous. Accessability to the press arose originally in *Gertz* as a rationale for limiting the *New York Times* standard to public officials and not as a defining term. As such it confounds the purpose of a definition (a rule of law) with the reasons for the rule. Despite the cases' repeated resort to this factor at least two other courts have also questioned whether access to the media is a proper part of the definition of a public figure. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 589 (1st Cir. 1980); *Reliance Ins. Co. v. Barron's*, 442 F.Supp. 1341, 1348 (S.D.N.Y.1977). Moreover, it seems clear to this court that the Supreme Court itself has deprecated access to the media as a term of the definition. The Court has described the possession of such access as "one of the accouterments of having become a public figure." *Hutchinson v. Proxmire*, 443 U.S. at 136, 99 S.Ct. at 2688.[24] It appears that evidence regarding the presence or absence of one's access to the media would be relevant evidence, appropriately presented to the trier of fact. However, because access to the media is not an element of the definition it is not deter-

---

**22.** As one court bemoaned "Of course, litmus tests that define what is and is not protected [are required]. Unfortunately, we do not have such tests. Until we find them, we must search for more precise articulations of all aspects of the *New York Times* rules...." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 8 (1980).

**23.** Both of the lower courts in *Hutchinson* apparently adopted this rationale as part of their definition and other courts have, to a lesser or greater degree, relied on this factor. *See Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d at 1254; *Rebozo v. Washington Post Co.*, 637 F.2d at 379; *Buchanan v. Associated Press*, 398 F.Supp. 1196, 1203, n.1 (D.D.C.1975); *Meeropol v. Nizer*, 381 F.Supp. at 34.

**24.** An accouterment, of course, is "an identifying but usually extraneous characteristic." Webster's Third New International Dictionary at p. 13 (1976). In some systems of logic, accouterments are known as "signs." That is, the presence of "a," usually signals the existence of "b," but not all "b's" need possess the characteristic of "a," nor does the absence of "a" necessarily require the conclusion that "b" is not present.

minative of, nor material to, the public figure determination.[25]

Accordingly, a dispute about a plaintiff's access to the media does not necessarily bar summary judgment. Disputed questions of fact only preclude summary judgment where they are material to the issue under consideration. The issue under consideration is whether a plaintiff is a public figure. Since as I hold above, access to the media is not a necessary element to determining who is a public figure, disputes concerning access to the media will not preclude summary judgment even though such evidence is admissible at trial. That is to say, evidence of access to the media has *some* tendency to prove that a plaintiff is a public figure and is thus admissible; nevertheless, since it is not a necessary element, nor is its absence determinative, a dispute concerning whether plaintiff has access will not preclude summary judgment.

Alternatively, some courts have sought to resolve the definitional question in terms of explicit or implicit lists of examples. *See Cepeda v. Cowles Magazines and Broadcasting, Inc.*, 392 F.2d 417, 419 (9th Cir.), *cert. denied*, 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968). This approach is equally unsatisfactory. A fundamental principle of logic is that an example is not a definition.[26] Sometimes the courts do not even articulate the exemplar mode but simply operate from some conscious (or possibly unconscious) list.[27] Indeed one court has admitted its inability to define who is a

public figure and explicitly endorsed the application of inarticulable subjective judgments. *See Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d at 861 ("it [public figuredom] falls within that class of legal abstractions where 'I know it when I see it' . . . . [citation omitted]."). Aside from the fact that the Supreme Court has specifically rejected such an approach, *see Gertz v. Welch*, 418 U.S. at 343–44, 94 S.Ct. at 3008–3009, I do not believe such despair is justified. I believe articulable definitions capable of application may be extracted from the Supreme Court cases. I refer to "definitions" in the plural since it is generally agreed that "[i]n trying to define who is a public figure, the court in *Gertz* created two subclassifications, persons who are public figures for all purposes and those who are public figures for particular public controversies." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1292. Below I will attempt to ascertain a definition of both public figure classifications.

### A. General Purpose Public Figure

■ For reasons expressed below, it is this court's opinion that a general purpose public figure in the context of a defamation suit may be defined as a person whose name is immediately recognized by a large percentage of the relevant population, whose activities are followed by that group with interest, and whose opinions or conduct by virtue of these facts, can reasonably be expected to be known and considered by that group in the course of their own indi-

---

**25.** Relevant evidence is evidence "having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable. . . ." (Fed.R.Evid. 401).

**26.** "To give examples is not to define a term." Beardsley, *supra* at 162. This is not to say that examples are not useful. As has been observed "[a]n exemplar is a (paradigmatic) device completely at home in the common law. Like case law, an exemplar fleshes out the meaning of a rule by generalizing the instances of its application. It is an authoritative example in which 'the general gains bite from the particular application.' [citation omitted]." *People v. Kimbrel*, 120 Cal.App.3d 869, 875, n.6, 174 Cal.Rptr. 816 (1981) (Blease, J.).

**27.** Thus one court disposed of the issue as follows: "In a defamation case, the question of public figure status is pervasive, and it should be answered as soon as possible. In some cases it may not be possible to resolve the issue until trial, but this is not such a case. [Plaintiff], a high-ranking official of a union of tremendous importance to our economy, as relates to his official duties is a public figure." *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). *Compare with Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1299 ("Being an executive within a prominent and influential company does not by itself make one a public figure.").

vidual decision-making. The relevant population in considering the breadth of name recognition is to be measured by the audience reached by the alleged defamation. The fame or notoriety achieved by a public figure must have preexisted the allegedly defamatory statements which give rise to the litigation. This definition is to be strictly construed and doubts are to be resolved in favor of a person being either a limited purpose public figure or a private person.

It is this court's belief that the definition set forth above accords with both the holdings of the Supreme Court and the purpose underlying the public figure doctrine. Thus, in *Gertz* the Court held that a person could become a public figure only upon a demonstration "of general fame or notoriety in the community, and pervasive involvement in the affairs of society...." 418 U.S. at 352, 94 S.Ct. at 3013. Such a person must have acquired a "role of especial prominence in the affairs of society...." *Time, Inc. v. Firestone*, 424 U.S. at 453, 96 S.Ct. at 964. The definition I have formulated above addresses these standards and also recognizes that in defining a public figure no specific field or public controversy is implicated. Thus, the definition I have arrived at above, rather than focusing on a particular public controversy, broadens the relevant scope of inquiry and focuses upon the decision making process of the relevant population.[28] Moreover, by focusing on the audience's decision making in general, the definition formulated here avoids the danger repeatedly adverted to by the Supreme Court that the definition of a public figure must not become a disguised vehicle for reintroduction of inquiry into what is a public controversy. *See Gertz v. Welch*, 418 U.S. at 346, 94 S.Ct. at 3010; *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. at 167,

99 S.Ct. at 2707. *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688. In this regard, the Supreme Court has repeatedly admonished that the classification must not depend upon the content of the defendant's activities since such a standard "would involve the courts in the dangerous business of deciding 'what information is relevant to self-government.' [citations omitted]." *Gertz v. Welch*, 418 U.S. at 339, 94 S.Ct. at 3006; *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688; *see also Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d at 1251–52, & n.20 (note particularly the Court's discussion of R. Posner, *The Right of Privacy*, 12 Ga.L.Rev. 393, 395–96 (1978)). *But cf. Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d at 590 & n.7 (suggesting that the task cannot be avoided under the *Gertz* approach to identifying public figures).

■ It is also clear that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688; *see also Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. at 167–68, 99 S.Ct. at 2707. The definition expressed here addresses this aspect of the problem by requiring that one's public figure status be determined only on the basis of those facts which preexisted the alleged defamation. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d at 591.

■ Although the question of whether a particular person is a public figure must turn on the "public" that is being referred to, the question of the relevant population has rarely been addressed by the courts. One court has observed, however, that "[i]n examining the status of the plaintiff in *Gertz*, the Court noted that he had 'no

---

**28.** The court wishes to emphasize that a general purpose public figure need not actually be seeking to influence public opinion. Rather, it is merely that the public figure's status permits us to assume that he or she is able to do so. This assumption, of course, underlies the endorsement mode of advertising, both in the commercial and political world. None of us is surprised when we see a particularly famous sports figure endorsing a certain brand of soda pop or a famous entertainer endorsing a particular politician. Brief consideration demonstrates that there is no reason to believe that either one knows anything more than the general public about the endorsed product or person. What is important to the advertiser is the status of the endorser, not his or her expertise concerning the endorsee.

general fame and notoriety *in the community*' and that he was not generally known to 'the local population.' [citation omitted]. We therefore conclude that nationwide fame is not required. Rather, the question is whether the individual had achieved the necessary degree of notoriety where he was defamed—i.e. where the defamation was published." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1295–96 n.22.[29] Some courts have apparently measured the population in terms of the region of the plaintiff's residence, *see Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d at 1253 ("[b]oth [plaintiffs] achieved 'pervasive fame or notoriety' at least regionally"); *see also Lawrence v. Moss*, 639 F.2d 634, 636 (10th Cir.), *cert. denied*, 451 U.S. 1031, 101 S.Ct. 3021, 69 L.Ed.2d 400 (1981) (status to be measured by state where "the events pertinent to this lawsuit all occurred...."). Such a standard does not appear helpful. First, one cannot know what region is appropriate—after all, every father may be considered well known in his own home. To put it another way, such a definition ultimately is circular. Everyone is always well known somewhere depending on how narrowly the region is drawn and, if the measure is to be where that person is well known, the standard is never a measure of anything. More to the point, however, it appears that this approach has been specifically rejected by the Supreme Court. In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154, the plaintiff was held to be a private person despite the fact that the plaintiff might have been a person of especial prominence in the affairs of Palm Beach Society. 424 U.S. at 453, 96 S.Ct. at 964.

Measuring the relevant population by the audience of the defamed statement, as the definition I propose here does, fulfills the purpose of the public figure doctrine. This focus accommodates the desire to provide breathing room necessary for free and open debate while protecting the individual's right to his or her good name. By restricting the scope of the relevant population to the population which the alleged defamation actually reached, one's public figure status is related directly to the potential harm caused but does not extend beyond the range of the defamation in issue.

Regarding the requirement that the definition of a public figure offered here is to be strictly construed, it should be noted that the Supreme Court has repeatedly observed that it is only a "small group of individuals who are public figures for all purposes." *Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. at 165, 99 S.Ct. at 2706; *see also Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1296 ("[f]ew people, of course, attain the general notoriety that would make them public figures for all purposes.") As the Supreme Court said in *Gertz* "We [should] not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes." 418 U.S. at 352, 94 S.Ct. at 3013.

■ An additional observation regarding the public figure definition set forth here appears to be called for. The definition of a general purpose public figure does not focus upon the activities of the plaintiff in seeking public attention. Initially this may be perceived as a weakness in the proposed definition, in that the Supreme Court has described one's attainment of public figure status as being dependent upon "the notoriety of their achievements or the vigor and success with which they seek the public's

---

**29.** The *Waldbaum* court observes, however, that this definition might not always pertain. It notes that "[d]issemination to a wide audience creates special problems. For example, an individual may be well known in a small community, but the publication covers a larger area. In such a situation, it might be appropriate to treat the plaintiff as a public figure for the segment of the audience to which he is well known and as a private individual for the rest.

In any event, the defamation's audience may be relevant in assessing damages, for injury may be less if the audience does not know of the victim and will have no occasion to interact with him in the future." 627 F.2d at 1296, n.22. For reasons set forth above, I have rejected the notion of subsections of population but, rather, address the problem in terms of the population to which the alleged defamation was addressed.

attention...." *Gertz v. Welch*, 418 U.S. at 342, 94 S.Ct. at 3008. It must be noted, however, that the Court's observation on this point is in the disjunctive in that it offers alternative means of attaining public figure status. Moreover, the court has recognized that "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own...." 418 U.S. at 345, 94 S.Ct. at 3009. Because this theoretical possibility must be accounted for, it appears to this court that the proposed definition is proper in omitting reference to the plaintiff's activities in seeking attention. As will be seen, however, the limited purpose public figure doctrine does focus on plaintiff's efforts in this regard.

In essence, the proffered definition seeks to confine the general purpose public figure to those individuals who can be fairly characterized as a "celebrity," *i.e.*, those whose names are a "household word." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1294. Only this limited group of people, whose names are recognized by the population at large and whose opinions and activities are regularly noted by the general public, fall into that category.

## B. *Definition of Limited Purpose Public Figure*

For reasons set forth below, this court defines a limited purpose public figure for purposes of a defamation action as a person who, by voluntary and intentional conduct, has vigorously sought to directly influence resolution of a particular controversy, identifiable as such from the intended audience's perception, resolution of which can reasonably be said to have a perceptible impact on persons other than the immediate participants in the controversy. For a person to be classified as a limited public figure for these purposes, the allegedly defamatory statement must be made within the scope of the particular controversy and must be reasonably related to that controversy.

The proposed definition again attempts to address the various elements of a limited purpose public figure in terms of the standards laid down by the Supreme Court, and the resolution of particular controversies by that Court. Thus, the definition attempts to encompass the notion that certain persons "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Welch*, 418 U.S. at 345, 94 S.Ct. at 3009. It also examines "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. at 3013. The definition offered here focuses on voluntary and purposeful conduct in order to exclude those cases in which, although a public controversy exists, plaintiff has not sought to intentionally involve himself or herself in the controversy. *See Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. at 166–68, 99 S.Ct. at 2706–2707. *See also Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 583 (8th Cir.), *cert. denied*, 445 U.S. 945, 100 S.Ct. 1342, 63 L.Ed.2d 779 (1980). It also attempts to distinguish between essentially private controversies (such as marital affairs) in which resolution of the dispute will not have an impact on anyone but the participants in the dispute, and controversies which will have an impact on others. *See Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154.

The definition recognizes that neither plaintiff nor defendant may be permitted to characterize the scope of the relevant controversy. Such post hoc characterizations must inevitably be biased by the existence of the litigation. Other objections to such a procedure seem clear. First, the Supreme Court has simply not permitted the scope of the debate to be determined by the alleged defamer (*see Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 and *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688); nor should the law permit the plaintiff to characterize the scope of the controversy. The latter prohibition is necessary because it is inappropriate to charge those engaged in the debate with the responsibility of "discovering and evaluating the inner beliefs and peculiarities of partic-

ular individuals and thus ... deprive the media of the very 'breathing space' that New York Times sought to create and protect." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1293–94.

In a very thoughtful opinion, Judge Tamm suggested that delimiting the scope of the controversy is a matter of the court attempting to ascertain "whether persons actually were discussing some specific question," *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d at 1297. Moreover, he suggested that it would be proper if the facts so permitted to specify broad controversies and subcontroversies in a particular case, and thus plaintiff could be characterized as a public figure for the subcontroversy and a private person for the broader controversy. 627 F.2d at 1297 n.27. Though the suggestion is not without merit, this court does not believe such an approach is appropriate. First, it leaves at large the scope of the controversy and accordingly leads to unpredictable and ad hoc results which the Supreme Court has held in *Gertz* to be unacceptable. 418 U.S. at 343–44, 94 S.Ct. at 3008–3009. Second, it fails to recognize that the speaker may have engendered a controversy which did not exist before. Third, and perhaps most importantly, it leaves a very large number of cases in which the scope of the controversy simply cannot be determined. Thus, as an example, during the latter days of the Nixon administration there can be no doubt that there was much public discussion about Watergate. Is that discussion to be defined by asking whether persons were speaking about corruption of the White House staff, the Executive Branch, the National Government, governments in general, the morality of the American people, other abstractions, ad infinitum? Indeed, the answer is, all and none. In any event, there appears to be no principled way to answer the question and thus the parties are left to ad hoc resolution of the question by each trier of fact.

While resolving the scope of the public debate, as I do, in terms of the reasonable perceptions of the intended audience may lead to some uncertain results, it has the virtue of a familiar (if abstract) legal standard, confined by the definition's emphasis on particularity. Moreover, to the degree that it looks to the intended audience, the definition focuses on the historical evidence in terms of the particular effort of this plaintiff—whether by book, speech, T.V. appearance, or whatever means he or she employed.

Finally, the definition addresses the particular controversy and requires that the alleged defamation be within the scope of that controversy. This aspect of the definition accords with the Court's repeated effort to ensure a proper and narrow controversy, *see Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 and *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450; *see also Lerman v. Chuckleberry*, 521 F.Supp. at 234, and avoids the suggestion that even when a person involves himself or herself in a particular controversy, that person's entire life, however irrelevant to the debate, is exposed to defamatory falsehood.

In essence, the proffered definition seeks to confine the scope of limited public figures to those who have "literally or figuratively '[mounted] a rostrum' to advocate a particular view." *Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. at 169, 99 S.Ct. at 2708 (Blackmun, J. concurring). It is only such persons who, under present doctrine, have placed themselves in such a position that the first amendment requires some lesser form of protection of their reputation. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273 (3d Cir. 1980) ("public figures are 'less deserving of [judicial] protection' ... [and] have assumed the risk of potentially unfair criticism...."); *Street v. National Broadcasting Co.*, 645 F.2d 1227, 1234–35 (6th Cir.), *cert. dismissed*, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); *but cf. Jenoff v. Hearst Corp.*, 644 F.2d 1004, 1007–08 (4th Cir. 1981) (stating that it is not clear whether one's lack of intent to influence the public is determinative of the issue or merely a significant factor in said determination).

## C. *Summary*

This court cannot say with firm conviction that the two definitions proposed above will prove over time satisfactorily to distinguish between those who are public figures and those who are private persons. Nonetheless, I believe they fairly reflect the intent of the Supreme Court, and are consistent with the results of most of the cases which have resolved the issue. Having reached at least a definition which satisfies the court in this case, I turn to an application of the principles enunciated above to the facts before the court.

## IV

## ARE THE PLAINTIFFS PUBLIC FIGURES?

I now turn to the question of whether either Dr. Thomas Harris or Amy Harris is a public figure within the meaning of the definition set forth above.

### A. *Dr. Thomas Harris*

█ Surprisingly there are many facts drawn from either Dr. Harris' curriculum vitae or his deposition which are uncontested. Certain material concerning the success of his book relative to other books appears to be hearsay, but does not appear to be contested and is not objected to. Accordingly, this material may be considered by the court. *Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981); *United States v. Veon*, 538 F.Supp. 237, 249 (E.D.Cal.1982). Remarkably, this court finds itself in the position of many of the courts which have considered the public figure question, that as to the evidence proffered in support of the motion, there is little dispute. The question is whether the facts proffered are sufficient to support the partial summary judgment which is sought.[30]

Dr. Harris obtained his M.D. from Temple University Medical School in 1940. He completed a one year medical internship at the United States Naval Hospital in Philadelphia and in 1941 was assigned as a ship's medical officer. From 1942 and through 1943 he was a resident in psychiatry at St. Elizabeth's Hospital in Washington, D. C. He took additional training in the Philadelphia Child Guidance Clinic from 1946 to 1957 and had additional training at the Baltimore Washington Psychoanalytic Institute. During his naval duty Dr. Harris was chief of psychiatry services at various United States Naval hospitals. During this period he was also the United States delegate to the organizational meeting of the Mental Health Division of the World Health Organization in Geneva, representing the National Association of Child Psychiatry. In 1952 he retired on a medical disability from the Navy, having attained the rank of Commander.

After leaving the Navy Dr. Harris pursued his profession in both a public and private practice. He was director of children's psychiatric services at the University of Arkansas School of Medicine, worked for the Department of Institutions (Penal, Correctional, Mental) for the State of Washington, and the Department of Professional Education at DeWitt State Hospital in Auburn, California. He also served as a consultant to the Arkansas State Department of Welfare, the Adoption Division of the Sacramento County Department of Welfare, the Bureau of Vocational Rehabilitation of the California State Department of Education, and the Sacramento Family Service Agency. From 1956 through 1974, while a member of the senior staff at Sutter Memorial Hospital and American River Hospital, Dr. Harris conducted his own private psychiatric practice in Sacramento, California.

Dr. Harris has held a number of teaching positions and has been the president and director of education of the Institute of Transactional Analysis in Sacramento, California. He also has held positions as the president and director of education at the

---

**30.** The parties hotly contest the facts regarding plaintiff's access to the media, but under the test formulated above, while admissible, these facts are not "material" to the public figure determination.

Harris Institute of Transactional Analysis, also in Sacramento, California.

Dr. Harris is a member of a large number of professional organizations and has held various positions in those organizations. He has published in a variety of professional journals and has presented papers to various professional organizations. Dr. Harris is listed in "Who's Who in America."

In 1965 Dr. Harris founded the International Association of Transactional Analysis which, according to Dr. Harris, is composed of at least "ten thousand members" active in counseling persons concerning mental and emotional problems. According to Dr. Harris, the organization has members "throughout the world." The purpose of this organization is to train and teach members the procedures and doctrine of transactional analysis.

On August 2, 1968, Dr. Harris signed a contract with Harper and Rowe publishers to publish his book "I'm Okay—You're Okay." In connection with the publication of the book, Dr. Harris' publishing company arranged for him to travel across the United States for the purpose of promoting the sale of the book through speaking engagements and other means.

At his deposition Dr. Harris testified that at least ten million copies of his Guide to Transactional Analysis "I'm Okay—You're Okay" had been sold by the end of 1979. The book has been translated into at least seventeen languages. It has also been marketed in three special editions: Braille, Large Print, and Tape Recorded readings of the entire book. Insofar as Dr. Harris knows, the only geographical area of the world that the book has not been sold in is possibly "the Far East, Asian countries." The relative success of the book seems well documented. Thus, the Seattle Times reported it as a top 5 best seller in Seattle in the non-fiction category during the month of September 1971. In November 1971, Publisher's Weekly (a trade journal) listed the book as the third runner up (after the top ten) in the non-fiction best sellers throughout 44 communities in the United States. In April 1972 the same journal listed it as the ninth non-fiction best seller, in June 1972 as the fourth non-fiction best seller, in May as the eighth non-fiction best seller, in August 1972 as the second non-fiction best seller, and in June of 1973 as the third best seller. In January 1973, Time Magazine listed it as its third non-fiction best seller. Finally, the publisher listed the book as one of its four best sellers for the year 1972.

The audience purchasing the book is not addressed in the documents filed, but Dr. Harris has testified that he has received communications from various clergymen and churches indicating the use of his book by them in their ministry.

The book is not of record, thus its full contents are not before the court. Nonetheless, various portions of the book are alluded to or quoted. Thus, in the book's preface Dr. Harris acknowledges that there is a current controversy concerning psychotherapy, its efficacy, methods, and techniques. In at least one place in the book Christianity is referred to in a favorable way.

Dr. Harris has lectured in Mexico, Canada, and Australia. He testified at his deposition that he has "evidence that indicates that all [people who have read the book] felt that the book was a strong factor in improving their life situation, in improving their understanding of themselves, giving them greater options with regard to changes in their life. . . . " Dr. Harris has testified that the book is used as a teaching tool "in practically all of the colleges in the country. . . . " He believes that "hundreds of millions of people" are affected by the book.

Dr. Harris has been referred to in at least 181 publications ranging from professional journals through newspapers and both professional and popular magazines. Finally, in this regard, it appears that Dr. Harris has on various occasions appeared on popular talk shows on television.

Much less appears in the record concerning the facts relating to the alleged defamation. This much at least is known. The

defendant Tomczak, a lay preacher, delivered an address to approximately 8,000 people at Chico, California, at a rally known as "Jesus West Coast '79." During the course of that speech the defendant Tomczak stated that the "author of that book [I'm Okay —You're Okay] committed suicide about two years ago." On October 2, 1979, in Washington, D. C., defendant Tomczak delivered an address before approximately 1,500 people wherein he indicated that the author of the book killed himself six months after he wrote it. One or the other of the speeches was tape recorded and there appears to be no question that the tape recording was played on at least one radio station in Sacramento, California. Whether Dr. Harris' audience and Mr. Tomczak's audience overlap is unknown; however, at the time of the alleged defamation, the defendant had not read "I'm Okay—You're Okay," nor did he know the name of its author.

Having set out above the undisputed facts, I will now analyze them in terms of the definitions developed in Section III of this Opinion.

■ There can be little doubt that until the publication of "I'm Okay—You're Okay" the only fair characterization of Dr. Harris' status was that used by his attorney —"an obscure but talented psychiatrist." Until the publication of the book there is no question that, despite his success in his profession and his honors, whatever definition of public figures applies, Dr. Harris was a private individual. *See Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411. The first issue presented is whether Dr. Harris was transformed into a general purpose public figure by virtue of the publication and sale of his very successful book and the publicity attendant thereon. In effect, the question that is before the court is—was Dr. Harris a "celebrity" as measured by the relevant population? The answer to that question cannot be ascertained from the evidence before the court. Although it is quite clear that Dr. Harris' book had wide sales, there is simply no evidence before the court which would clearly demonstrate that the author was as

well known as the book. Moreover, it cannot be ascertained whether the alleged libel reached persons who knew the book and knew that Dr. Harris was its author. It may well be that both the people attending the two rallies and those hearing the tape on the radio were unfamiliar with the work or the author. Of course, the opposite may be true and the two audiences may have overlapped. The point is, there is simply insufficient evidence bearing on the subject before the court. While it is true that the defendant himself did not know the name of the author of the book and, indeed, had not read the book himself at the time that he made the allegedly defamatory statements, that fact, while ironic and perhaps having some bearing on the issue, is hardly conclusive. Thus the court is satisfied that the facts are simply insufficient to rule that either party is entitled to judgment on the general purpose public figure issue as a matter of law.

■ The question of whether or not Dr. Harris is a limited purpose public figure is somewhat more complex. Dr. Harris admits that he voluntarily, intentionally, and vigorously sought to directly influence resolution of a particular controversy. He characterizes that controversy as one concerning the source of, and the appropriate method of treating mental and emotional problems. Even conceding plaintiff's characterization of the controversy, however, much of the evidence suggests that he was a limited purpose public figure in terms of that controversy. First, as I noted, Dr. Harris admits voluntary involvement in the particular controversy. Second, resolution of the controversy concerning psychotherapy would have a perceptible impact, not only among psychiatrists and other mental health workers (*i.e.,* those participating in the controversy), but among the populace at large, many of whom seek treatment. All of these facts suggest that plaintiff was a limited purpose public figure in the field of psychotherapy. Even so, disputed issues of fact preclude the court from granting summary judgment. Defendant has simply failed to demonstrate that his remarks were

in any way directed to the field of psychotherapy which the plaintiff characterizes as the controversy.

Perhaps recognizing this problem, defendant characterizes the controversy in a broad fashion relating to what sources are appropriate for a Christian to use in deciding how to lead a happy and satisfying life. Even given this characterization, however, summary judgment must be denied for defendant has failed to demonstrate plaintiff's involvement in such a controversy.

While it appears to be uncontested that various churches have used the book as a text for instructing pastors in counseling parishioners, the significance of this fact is dependent on facts not before the court. In today's world a minister may have a variety of functions—some bearing on his duty as a preacher of the Word, others on his capacity as a comforter of his parishioners. The material of record does not itself indicate for which of these purposes the book was being used.

Under the definition, however, it will be remembered that neither the plaintiff nor the defendant's characterization is significant. Rather, the scope of the controversy must be examined from the perspective of the audience for plaintiff's work. As I have noted, the book is not of record. Thus, the court does not have a primary piece of evidence to enable it to characterize the appropriate scope of the controversy in which Dr. Harris has involved himself. Nor does it appear that the book was the sole means by which Dr. Harris sought to involve himself in a controversy. Evidence of Dr. Harris' speeches, teaching, T.V. appearances and the like might also bear upon the issue. Moreover, it appears there may be additional evidence which might bear upon the question which has not been provided the court.[31]

For all of these reasons, the court determines that there is insufficient evidence to resolve the issue of whether Dr. Thomas

Harris is a public figure. Thus, defendant has failed to satisfy his burden on the motion for partial summary judgment.

### B. *Amy Harris*

■ Amy Harris is the wife of the plaintiff and the co-author of the book. She is not listed, however, as co-author on the book itself. Since it cannot be doubted that her name is considerably less known than her husband's, it cannot be reasonably argued that she is a general purpose public figure. Since there are no facts which suggest that she is any more of a limited purpose public figure than Dr. Harris himself, for the reasons that the motion has been denied as to Dr. Harris, it must also be denied as to Amy Harris.

### CONCLUSION

For all of the reasons set forth above, the court now denies defendant's motion.

IT IS SO ORDERED.

---

**31.** Mr. Tomczak in his reply brief filed with the court a portion of an article from a religious magazine "A Pastoral Renewal" published in June 1977 concerning the book. It characterizes the book and its approach to life as straying from the biblical picture of how human beings ought to live. While this article suggests that at least some readers may have perceived the book as implicating this issue, such tenuous evidence can hardly be sufficient to determine what the reasonable reader would have concluded the book was about.