Charles G. REBOZO, Plaintiff-Appellant-Cross Appellee,

v.

The WASHINGTON POST COMPANY, Defendant-Appellee-Cross Appellant.

No. 78–3403.

United States Court of Appeals, Fifth Circuit.

Feb. 19, 1981.

Rehearing Denied April 29, 1981.

Sherryll Martens Dunaj, William S. Frates, Alan G. Greer, Miami, Fla., for plaintiff-appellant-cross appellee.

Steel, Hector & Davis, Patricia A. Seitz, Talbot D'Alemberte, Miami, Fla., Williams & Connolly, Kevin T. Baine, John B. Kuhns, Edward Bennett Williams, Washington, D.C., for defendant-appellee-cross appellant.

Before WISDOM, RONEY and HATCHETT, Circuit Judges.

RONEY, Circuit Judge:

This is an appeal from a summary judgment entered for the defendant newspaper in a defamation suit. The district court found that plaintiff was a public figure and that no genuine issue of material fact existed as to whether defendant acted with actual malice. We affirm the court's finding that plaintiff is a public figure. We reverse, however, as to the decision that there was no genuine issue of material fact on the question of whether defendant acted with actual malice in publishing the newspaper article that forms the basis of this suit, and remand for further proceedings.

I. *FACTS*

Because the case was decided on defendant's motion for summary judgment, we must construe the record most favorably to plaintiff. *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 162 n.5, 99 S.Ct. 2701, 2705 n.5, 61 L.Ed.2d 450 (1979); *Time, Inc. v. Ragano*, 427 F.2d 219, 221 (5th Cir. 1970).

In June 1973 Ronald Kessler, a reporter with substantial financial and reporting experience for defendant's newspaper, *The Washington Post*, was assigned by his editor to prepare a series of articles on the finances of then-President Richard M. Nixon. As part of his preparation Kessler became interested in plaintiff Charles G. Rebozo because of his relationship with the former President. Rebozo had been, and continues to be, a close friend and financial adviser of the former President, and serves as chairman of the board and president of the Key Biscayne Bank in Miami.

*Newsday*, a Long Island, New York, newspaper in 1971 had published a series of articles about Rebozo, one of which described a Miami lawsuit involving allegations that the Key Biscayne Bank had converted 900 shares of stock belonging to E.F. Hutton & Co. Some of the stock had apparently been pledged as collateral for a loan at the Key Biscayne Bank, and was later sold when the loan was called. During the course of his investigation, Kessler reviewed the file in the case, which by that time was pending in this Court on appeal, in order to determine whether it contained any subsequent unreported developments. *See Fidelity & Casualty Co. v. Key Biscayne Bank*, No. 70–619–Civ–JLK (S.D.Fla. Jan. 24, 1972) (order granting defendant's motion for directed verdict), *vacated and remanded*, 483 F.2d 438 (5th Cir. 1973), *dismissed* (S.D.Fla.1973), *aff'd*, 501 F.2d 1322 (5th Cir. 1974).

Among other things Kessler studied the deposition of George H. Riley, Jr., who had been retained to investigate a claim filed by E.F. Hutton with its surety, the Fidelity and Casualty Company of New York. In his deposition, Riley described a meeting he had with Rebozo in October 1968 as follows:

Q  Did you tell Mr. Rebozo at that time that the stock had been stolen or was missing from E. F. Hutton & Co.?

A  Yes, sir.

Q  Can you recall exactly what you told him?

A  As I previously stated, I advised Mr. Rebozo that I was investigating the theft of nine 100–share certificates from the vaults of E. F. Hutton & Co. in New York.

Q  Did you advise him of the numbers of the certificates that you were investigating?

A  Yes. And the numbers corresponded to the numbers he gave me.

It is undisputed that 300 shares of the stock were sold on November 13, 1968, although

the parties differ on whether the stock was sold by the Key Biscayne Bank itself, or on Rebozo's personal account.

After Kessler read the court file in Miami and New Orleans, he called Riley on the telephone because, as Kessler described, "I wanted, somehow to get a feeling from him, at least as to whether he understood the possible significance of his testimony." Kessler recounted a portion of his telephone conversation with Riley as follows on deposition:

Q  Did you specifically ask him whether his statement in the deposition concerning his conversation with Mr. Rebozo was accurate?

A  No.

Q  Why not?

A  I attach great significance to testimony given under oath and most newspaper articles, of course, are based on statements that are not made under oath. So, when a reporter obtains statements that are made under oath, it is certainly of more significance than otherwise.

Q  It would have been significant, wouldn't it Mr. Kessler, if Mr. Riley told you he had made an error or a misstatement in his sworn testimony?

A  Yes.

Q  You didn't think it important to find out whether he would say whether he was right or wrong in that statement?

A  No.

Q  You didn't want to know what he wanted to say on that issue?

[Objection omitted]

Kessler also contacted Rebozo's attorney, who told him Rebozo "flatly denies" that Riley told Rebozo during their October 1968 meeting that the stock was stolen. The attorney followed up the conversation with a letter, repeating that Riley's testimony was false in that respect.

The question whether Rebozo personally, or the Bank, had cashed the stock was the subject of an October 6 internal memorandum from Kessler to his *Post* editor, Harry Rosenfeld, prompted by the telephone conversation between Kessler and Rebozo's attorney. A portion of that memorandum states:

So who cashed the stock? Neither Rebozo nor other witnesses were asked this question in the depositions. There are no other legal papers in the court file to answer the question.

But there are copies of the bills, receipts, and checks covering the sale transaction. As is clear from the attached, they all bear Rebozo's name.

\*    \*    \*    \*    \*    \*

The fact that Rebozo's name appears on them, and that the transactions were executed on his personal account, appear to me to be more than sufficient evidence for the purposes of an accurate and fair newspaper account of what appears in the court file that Rebozo technically and substantively cashed the stock.

Kessler and Rosenfeld discussed the content of an article Kessler had prepared on the stock transaction, and reviewed the sources of the information contained in the article.

On October 25, 1973, *The Washington Post* published a front-page article containing the headline, "Bebe Rebozo Said to Cash Stolen Stock," accompanying a photograph of plaintiff, and the following four paragraphs:

Charles G. (Bebe) Rebozo, President Nixon's close friend, cashed $91,500 in stolen stocks in 1968 after he was told by an insurance investigator it was stolen, the investigator's sworn statement and other records in a Miami court file indicate.

A lawyer for Rebozo conceded the investigator visited Rebozo but said Rebozo "flatly denies" the investigator told him the stock was stolen.

The $91,500 in securities represented 300 of the 900 shares of International Business Machines Corp. stock that federal prosecutors say was stolen by the Mafia in 1968 from the vaults of E. F. Hutton & Co., a New York stock brokerage firm.

The stock came into Rebozo's possession when it was offered as collateral for a loan from Rebozo's bank, Key Biscayne Bank in Florida.

The story continued for a total of 126 paragraphs, with the balance of the article appearing on pages A14 and A15 of defendant's newspaper. The "main point" of the story, according to Kessler, was contained in the "lead," or first paragraph. Farther along in paragraph number 99, the *Post* article quoted the passage from investigator Riley's deposition, in which Riley was questioned about whether the stock "had been stolen *or was missing*." (emphasis added).

Rebozo's complaint contends the article's lead sentence is false in two respects: (1) the investigator did not tell him the stocks were stolen; and (2) the stocks were cashed by the bank, not by him. The question of the article's falsity, however, is not an issue in this appeal.

## II.  *WAS REBOZO A PUBLIC FIGURE?*

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that a public official cannot recover damages for defamation relating to official conduct absent a showing of " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 725–26. Three years later the Court held in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), that the *New York Times* standard is applicable to "public figures" as well. *See also Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The Court elucidated the applicability of *New York Times* to public figures, but refused to expand the protection afforded by that standard to actions brought by private persons, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–47, 94 S.Ct. 2997, 3009–10, 41 L.Ed.2d 789 (1974).

Application of the *New York Times* rule to public figures, the Court observed, is supported by two factors. First, public figures, because they "enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy," are less vulnerable to injury from defamatory statements. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 344, 94 S.Ct. at 3009; *see Wolston v. Reader's Digest Association, Inc.*, 443 U.S. at 164, 99 S.Ct. at 2706. A second consideration, and one that has been given greater weight by the Court, is that public figures, the news media may assume, "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009. The Court went on to describe two ways in which a person may become a public figure for first amendment purposes.

> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.

418 U.S. at 345, 94 S.Ct. at 3009. *See also Wolston v. Reader's Digest Association, Inc.*, 443 U.S. at 164, 99 S.Ct. at 2706; *Time, Inc. v. Firestone*, 424 U.S. 448, 453, 96 S.Ct. 958, 964, 47 L.Ed.2d 154 (1976). Thus, under the analysis suggested in *Gertz v. Robert Welch, Inc.*, two types of public figures emerge: Those who are public figures for all purposes, and those who are public figures for a limited range of issues.

The district court held as a matter of law that plaintiff "had achieved such pervasive fame and notoriety as of ... the date of publication ... that he had become a public figure 'for all purposes and in all context' " (*quoting Gertz v. Robert Welch, Inc.*, 418 U.S. at 351, 94 S.Ct. at 3012). Our review of this conclusion requires that we consider, first, whether plaintiff's purported status as a public figure is appropriate for decision on summary judgment and, second, whether the evidence considered in a light most favorable to plaintiff, shows him to be a public figure for the purposes of this litigation.

■ The Supreme Court has on numerous occasions, treated the public figure and public official questions as matters of law, for the trial court to decide. *See, e. g., Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789; *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966). This Court has observed in this same context that "where undisputed facts admit to but one conclusion, then, on motion for summary judgment, the court properly decides the issue." *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 862 (5th Cir. 1978). Even if summary judgment were improper because of issues of fact that could only be resolved after evidentiary hearing, the trial court, not a jury, must determine whether the evidence showed that plaintiff was a public figure. *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238 (5th Cir. 1980). In the absence of conflicting inferences to be drawn from the record in this case, we conclude the district court was justified in considering the public figure question on summary judgment.

■ The record in this case contains sufficient undisputed facts to show that Rebozo, at the time of publication, was a public figure. As is well known, Rebozo was President Nixon's closest friend while Nixon was in the White House. While this in and of itself has considerable significance, we need not decide whether a confidential relationship with the President of the United States automatically converts one into a public figure, since the record indicates Rebozo had in other ways voluntarily exposed himself to the risk of close public scrutiny.

Rebozo played a substantial role in the former President's financial affairs, acting as the President's agent in the management of the President's bank accounts at the Key Biscayne Bank, and in the purchase of two homes. Plaintiff also played a role in the purchase and sale of other investments for the former President. In addition Rebozo's relationship with the President was not confined to counseling on business and financial matters. Rebozo freely admitted he offered his opinions to President Nixon on various matters, and transmitted to the former President the views of other important people on certain policy matters. The two discussed the Watergate situation when it began to arise in late 1973.

More significantly for purposes of this case, Rebozo played an active role in the President's 1972 re-election campaign, helping to arrange major contributions for the President's political benefit. The Senate Select Committee on Presidential Campaign Activities, the so-called Watergate Committee, investigated closely Rebozo's role in the 1972 campaign and his involvement in President Nixon's finances, eventually publishing five volumes of data describing Rebozo's connections with the former President and his campaign.

Press coverage of Rebozo has focused both upon his relationship to the President and upon his own business and personal affairs, although the public's interest in his activities has certainly been enhanced by his connections with the former President. The record indicates that during the six months prior to October 25, 1973, the date of the *Washington Post* article, *The New York Times* published 48 articles mentioning Rebozo, while *The Miami Herald* published 76. Prominent stories in 1968 and 1971, in *The New York Times* and *Newsday*, described Rebozo's business and financial dealings in some detail. Rebozo himself recognized, "[W]hen you are traveling in the circles that I have traveled in, there are press people all over the place."

In view of the foregoing, Rebozo, met, as a matter of law, both *Gertz v. Robert Welch, Inc.*, public figure considerations. First, he "enjoy[ed] significantly greater access to the channels of effective communication and hence [had] a more realistic opportunity to counteract false statements than private individuals enjoy." 418 U.S. at 344, 94 S.Ct. at 3009. There is evidence in the record that following publication of the *Post* article, both *The Miami Herald* and a major television network published Rebozo's response.

Second, on the basis of his voluntary activities, "the communications media [were] entitled to act on the assumption" plaintiff "had voluntarily exposed [himself]" to the risk of close public scrutiny. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. 3009. Rebozo's activities—including his association with President Nixon, taking part in his financial affairs, and involvement with the re-election effort—made him a prime subject of public comment.

Accordingly, we affirm the district court's conclusion that for the purposes of this litigation plaintiff Rebozo was a public figure at the time this article was published.

### III. WAS THE MALICE QUESTION APPROPRIATE FOR RESOLUTION ON SUMMARY JUDGMENT?

The district court, having decided that plaintiff was a public figure, applied the correct standard of liability but held there was no genuine issue of material fact on the question of "actual malice," as defined by *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. Because we conclude that the facts in this case, taken in a light most favorable to Rebozo, raised such an issue of fact, we reverse the summary judgment entered for defendant.

In *New York Times Co. v. Sullivan*, the Supreme Court held the First Amendment precludes recovery by a public official for defamation unless the plaintiff can prove the statement was made with actual malice. A person has acted with actual malice when a statement is made with knowledge that it was false, *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26, or with a high degree of awareness of the statement's probable falsity, *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), or with reckless disregard of whether the statement was false or not, *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. *See Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980); *Long v. Arcell*, 618 F.2d 1145, 1147 (5th Cir. 1980). The Supreme Court has further defined the phrase "reckless disregard":

There must be sufficient evidence to permit the conclusion that the defendant in fact entertained *serious doubts* as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (emphasis added). *See* Eaton, *The American Law of Defamation Through* Gertz v. Robert Welch, Inc. *and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1370–75 (1975). Recklessness cannot be inferred, however, from the mere combination of falsehood and the defendant's general hostility toward the plaintiff, nor may reckless disregard be inferred from negligence. *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, 398 U.S. 6, 10, 90 S.Ct. 1537, 1539, 26 L.Ed.2d 6 (1970); *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325.

The parties argue at some length as to whether summary judgment is a "peculiarly appropriate vehicle for the disposition of libel suits governed by the actual malice standard of *New York Times*." Appellee's brief at 30. In all candor, there is a certain amount of confusion in our cases on this question. Some of our cases have recognized that the plaintiff's standard of proof on the actual malice issue is higher than other issues and have thus concluded that actual malice is "an issue which lends itself to summary judgment." *E. g., Southard v. Forbes, Inc.*, 588 F.2d 140, 146 (5th Cir. 1979), *cert. denied*, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1980). Other cases have suggested that the need under the First Amendment to protect publishers from the chilling effect of a long and expensive trial justifies a presumption in favor of summary judgment. *See Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 864–65 (5th Cir. 1970); *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969). Other cases, however, have recognized that actual malice refers to the mental state of the defendant with respect to the truthfulness of the allegedly defama-

tory material and that "[p]roof of such a mental state must usually be inferred from circumstances difficult to develop on motion for summary judgment." *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971). *See also Time, Inc. v. Ragano*, 427 F.2d 219 (5th Cir. 1970). Even those cases strongly urging summary judgment describe it as proper only where the record is "devoid of genuine issues of fact" on the actual malice question. *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d at 865.

In view of this uncertainty, it is appropriate to examine closely the recent Supreme Court authority related to this inquiry. The subjective nature of the evidence a plaintiff must rely on was emphasized by the Supreme Court in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), where it was held that "any direct or indirect evidence relevant to the state of mind of the defendant," *id.* at 165, 99 S.Ct. at 1643, could be used to support plaintiff's burden of showing actual malice with convincing clarity. The implications of this holding with respect to summary judgment disposition were noted in a case decided that same term, *Hutchison v. Proxmire*, 443 U.S. 111, 120 n.9, 99 S.Ct. 2675, 2680 n.9, 61 L.Ed.2d 411 (1979):

> Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times Co. v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), and does not readily lend itself to summary disposition. See 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, pp. 590–592 (1973). Cf. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

*Herbert v. Lando* also casts serious doubt on the notion that the chilling effect of a long and expensive trial justifies a presumption in favor of summary judgment, at least to the extent that such a presumption exceeds the balance struck between the rights of publishers and defamation plain-

tiffs in *New York Times v. Sullivan*. The Court reiterated that the First Amendment does not provide a publisher complete immunity and that if "inhibition flows from the fear of damages liability for publishing knowing or reckless falsehood, those effects are precisely what *New York Times* and other cases have held to be consistent with the First Amendment." 441 U.S. at 171, 99 S.Ct. 1646, 60 L.Ed.2d 115. While the Court recognized the burden and expense of pretrial discovery in First Amendment defamation cases, that was not enough, it held, to modify the standard set in *New York Times v. Sullivan*. 441 U.S. at 175–77, 99 S.Ct. 1648–49, 60 L.Ed.2d 115.

Laying aside the suggestion that the potential chilling effect of the burdens of litigation are in and of themselves grounds for preferring summary judgment, an idea repudiated by *Herbert v. Lando*, the cases in this Circuit can be reconciled. These cases stand for the principle that the standard of review in First Amendment defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1258 (5th Cir. 1980), the evidence and all the inferences which can reasonably be drawn from it must meet that higher standard.

■ On this record we conclude the district court was confronted with a genuine issue of material fact on the details of investigator Riley's conversation with Rebozo, and reporter Kessler's review of it. In investigating the story, even though Kessler went to the trouble of calling Riley, he failed to review with Riley the words in Riley's earlier deposition upon which Kessler eventually based the article's lead. Regardless of whether Riley knew at the time

of his conversation with Rebozo whether the pledged stock had in fact been stolen, the seminal question may be what Riley actually told Rebozo before the stock was sold to cover the loan. We note in passing that on the second appeal in the conversion case, the Court found that not until December 1968, nearly two months after the stock sale, did E. F. Hutton learn that the stock involved in this case was among those shares that had been missing from its vault. *Fidelity & Casualty Co. v. Key Biscayne Bank*, 501 F.2d 1322, 1324 (5th Cir. 1974). Despite Kessler's professed belief in the veracity of Riley's deposition testimony, Kessler's resolution of the obvious ambiguity whether Riley told Rebozo the stock was (a) missing, (b) stolen, or (c) missing or stolen, in favor of the most potentially damaging alternative creates a jury question on whether the publication was indeed made without serious doubt as to its truthfulness. *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326.

There is, moreover, a material question of fact suggested by Kessler's October 6, 1973 memorandum to his editor, in which the reporter expressed uncertainty about whether the Key Biscayne Bank or Rebozo himself cashed the stock. Kessler stated in that memorandum that if the bank, rather than Rebozo, had actually cashed the stock, the article's proposed lead paragraph would have to be modified. This memorandum, plus the fact that Kessler resolved the uncertainty expressed in it in such a way as to cast plaintiff Rebozo in the worst possible light and to make for Kessler a front-page story of an episode which otherwise might not have commanded any significant attention, when taken in a light most favorable to Rebozo, could amount to evidence of the reporter's reckless disregard for the truth or falsity of the assertion that "Charles G. (Bebe) Rebozo, President Nixon's close friend, cashed $91,500 in stolen stock ...." *See St. Amant v. Thompson*, 390 U.S. at 731–32, 88 S.Ct. at 1325–26; *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. Thus we cannot say "the record is devoid of genuine issues of fact as to whether the alleged defamatory state-

ment was published with actual knowledge of its falsity or with reckless disregard of whether it was true or false." *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d at 865. Accordingly, the district court's summary judgment on the question of actual malice is reversed and the case is remanded for further proceedings.

REVERSED AND REMANDED.