William P. TAVOULAREAS, et al., Plaintiffs,

v.

The WASHINGTON POST COMPANY, et al., Defendants.

William P. TAVOULAREAS, et al., Plaintiffs,

v.

Philip PIRO, Defendant.

Civ. A. Nos. 80–3032, 80–2387.

United States District Court, District of Columbia.

May 2, 1983.

John J. Walsh and Joseph Artabane, Washington, D.C., for plaintiffs.

Irving Younger, David Kendall, and Kevin Baine, Washington, D.C., for defendants in No. 80–3032.

## MEMORANDUM

GASCH, District Judge.

Plaintiffs, William P. Tavoulareas and his son Peter, filed suit in this case against defendants, The Washington Post Company (WPC), Patrick E. Tyler, Sandy Golden, Benjamin C. Bradlee, and Robert U. Woodward.[1] Plaintiffs claimed that they were libeled by two articles concerning the establishment of Atlas Maritime Corporation and its relationship with Mobil Oil Corporation published in *The Washington Post* (*The Post*) on November 30, 1979 and December 1, 1979. Defendant Tyler, an investigative

reporter for *The Post,* wrote the stories aided by defendant Golden, a freelance reporter who contributed to the first article and was designated in it as a "special correspondent." Basically, the complaint alleged that these articles falsely suggested that William Tavoulareas, the president of Mobil, used his influence to set up and maintain his son Peter in Atlas, a London-based shipping firm. On July 30, 1982, a jury found that defendants WPC, Tyler and Golden had libeled the elder Tavoulareas in the November 30 article.[2] They awarded him $250,000 in compensatory and $1.8 million in punitive damages.[3] This matter is currently before the Court on the defendants' alternative motions for judgment notwithstanding the verdict (n.o.v.), new trial or reduction in the amount of the judgment.[4] For the reasons discussed below, the Court finds an insufficient evidentiary basis to support the jury's verdict and, therefore, grants defendants' motions for judgment n.o.v.

I. *The Standard for Judgment n.o.v. Under Rule 50(b) of the Federal Rules of Civil Procedure*

Defendants bear a heavy burden of proof on their motions for judgment n.o.v. A trial court may grant such a motion only when "the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict." *Vander Zee v. Karabatsos,* 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). A court may not evaluate the credibility of the evi-

---

1. Plaintiffs also included Katharine Graham, Chairman of the Board and Chief Executive Officer of The Washington Post Company, in their original complaint but on September 10, 1981, this Court entered summary judgment in her favor dismissing her from the case.

2. The jury found that Bradlee and Woodward were not liable to either of the plaintiffs; that WPC, Tyler, and Golden were not liable to William Tavoulareas for the publication of the December 1 article; and that WPC, Tyler, and Golden were not liable to Peter Tavoulareas for either of the two articles.

3. The jury assessed the compensatory damage award against defendants WPC, Tyler and Golden but the punitive damage award was assessed only against defendant WPC.

4. In the consolidated case of *William P. Tavoulareas v. Philip Piro,* Civil Action No. 80–2387, the jury found defendant Piro liable to both Tavoulareases for slander. They awarded Peter $1,000.00 and William $5,000.00 in compensatory damages. Currently pending before the Court, but not addressed in this opinion, is defendant Piro's motion for judgment n.o.v.

dence and if there is conflicting evidence present in the record, the motion may not be granted. 5A J. Moore, *Moore's Federal Practice* ¶ 50.07[2] (2d ed. 1982). If, however, the nonmoving party has presented only a "mere scintilla" of evidence at trial, the verdict may not stand. *Pennsylvania R.R. Co. v. Chamberlain,* 288 U.S. 333, 343, 53 S.Ct. 391, 394, 77 L.Ed.2d 819 (1933); *Murray v. Towers,* 239 F.2d 914, 915 (D.C. Cir.1956); *Riss & Co. v. Association of American Railroads,* 187 F.Supp. 306, 312 (D.D.C.1960).

Technically, a motion for judgment n.o.v. is merely the renewal of a motion for directed verdict made at the close of all the evidence. 9 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2537 at 596 (1970). The standard for granting a judgment n.o.v. is, therefore, the same as the standard for awarding a directed verdict.[5] *Id.* at 599. *See Lester v. Dunn,* 475 F.2d 983, 985 (D.C.Cir.1973).

## II. *Actual Malice and the Public Figure Plaintiff*

Just as the defendants at this stage of the proceeding face a stringent test for the successful maintenance of a motion for judgment n.o.v., plaintiff faced a substantially different, but equally difficult, task at trial. On June 30, 1982, this Court held that William Tavoulareas was to be considered a public figure for purposes of this trial.[6] As a result of this ruling, plaintiff had to establish by *clear and convincing* evidence, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974),[7] that the defendants published

the November 30 article with "actual malice." In this context, plaintiff must show that *The Post* published the article either knowing at the time of publication that it was false or with reckless disregard of its truth or falsity. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. at 342, 94 S.Ct. at 3008.

The Supreme Court first developed the actual malice standard in *New York Times Co. v. Sullivan.*[8] Emphasizing the importance of uninhibited, robust discussion on public issues, the Court noted that such discussion might include "vehement, caustic, and sometimes unpleasantly sharp attacks" on certain public officials. *Id.* at 270, 84 S.Ct. at 721. Despite the fact that some of these attacks may be erroneous and defamatory, the Court held that statements of this variety must be protected if the First Amendment is to retain its vitality. *Id.* at 271–72, 84 S.Ct. at 721–22. In subsequent decisions, however, the Court excluded one type of defamatory speech from constitutional protection. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Court explicitly held that the calculated falsehood, "the lie, knowingly and deliberately published about a public official", makes no contribution to society's vigorous interchange of ideas and is, therefore, beyond the constitutional pale. *Id.* at 75, 85 S.Ct. at 216.

Under the standards enunciated by the Supreme Court, therefore, the jury verdict in this case will withstand the motions for judgment n.o.v. only if there is suffi-

---

**5.** A motion for directed verdict may only be granted when all the evidence

> ... along with all inferences reasonably to be drawn therefrom, when viewed in the light most favorable to the plaintiff is such that reasonable jurors in fair and impartial exercise of their judgment could not reasonably disagree in finding for the defendant ....

*Alden v. Providence Hospital,* 382 F.2d 163, 165 (D.C.Cir.1967).

**6.** On July 17, 1982, this Court held a further hearing on the public figure status of William Tavoulareas in order to reconsider its June 30

ruling. On July 26, 1982 the Court issued a memorandum adhering to the earlier ruling.

**7.** *See also Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (1971); *Waskow v. Associated Press,* 462 F.2d 1173, 1175 (D.C.Cir.1972); *Logan v. District of Columbia,* 447 F.Supp. 1328, 1331 (D.D.C. 1978).

**8.** *Sullivan* involved a public official plaintiff rather than a public figure plaintiff but the basic lesson to be gleaned from that case is the same.

cient evidence in the record from which a jury could reasonably find, by clear and convincing proof, that the defendants published the November 30 article with actual malice.[9] The article in question falls far short of being a model of fair, unbiased, investigative journalism. There is no evidence in the record, however, to show that it contained knowing lies or statements made in reckless disregard of the truth. Reviewed under the stringent test set forth by the Supreme Court in *New York Times Co. v. Sullivan,* the verdict in plaintiff's favor must be set aside.

### III. *Plaintiff's Arguments in Support of the Verdict*

As a preliminary matter, it should be noted that this article was neither "fabricated" by the defendants nor was it based merely upon the imaginations of two newspaper reporters. *See St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968). Despite the fact that certain portions of the story may have been "slanted," the record clearly reflects that Tyler expended a large amount of time and effort on its preparation. Among others, he interviewed George Comnas, the first managing director of Atlas, John Kousi, a Saudi Maritime Company (Samarco) director, and Lewis Lapham, a member of the Mobil board of directors. He researched the oil tanker management business and reviewed documents from the Federal Maritime Commission, the Subcommittee on Energy and Power of the Committee on Interstate and Foreign Commerce of the United States House of Representatives, and the Securities and Exchange Commission (SEC). Tyler attempted to speak to high level Mobil executives and to William and Peter Tavoulareas on a number of occasions but they consistently rebuffed his efforts. Mobil ultimately responded to Tyl-

er's requests by furnishing him with written responses to his inquiries, and he included most of this information in the article.

■ This undisputed evidence of Tyler's extensive preparation is not dispositive, however, of the issue of actual malice. A reporter cannot shield himself from a charge of reckless disregard merely by showing that he invested a large amount of time and effort on an article's preparation. Plaintiff has provided four major bases from which he contends the jury could have properly found that the defendants acted with actual malice. Each of these contentions is addressed below.

### A. *The Christine Peterson Memorandum*

At the time *The Post* published the November 30 article, the newspaper employed Christine Peterson as a copy editor. At trial she described her duties as follows:

> A copy editor is a [sic] last person on the news room floor to see a piece of copy report [before it] goes into the composing room to be set into type. The copy editor basically edits a story for style, punctuation, grammar, checks what facts can be checked, with source material at hand, things like the population of the State of Utah or the area of Lake Superior, that sort of thing.

Trial Transcript at 2827. Ms. Peterson had the task of performing this "final edit" on the November 30 article. On November 27 she took the rather unusual step of writing a memorandum to her superior, Peter Milius, and discussed certain problems she had with Tyler's story. She stated that:

> I've read the Mobil story several times, and while I'm impressed with the amount of work the reporter obviously did, I'm still left with an overwhelming sense of So What? Is there any way to give this

---

**9.** Of course, plaintiff also had to prove that the allegedly libelous statements were false. At trial, in opposition to plaintiffs' claims that many of the statements in the articles were false, defendants steadfastly maintained that every word in both articles was true. Because the Court finds that there was no proof of actual malice, it does not have to address this question directly.

story of high-level nepotism a dollars-and-cents angle? Did Mobil's shareholders lose anything? Mobil's customers? Parts of Tyler's case against Tavoulareas seem tenuous, and the whole—a $680,000-a-year plaything for an indulged son, at worst—just seems like a withered peanut in an 84″ gilded shell.

A far more interesting angle, it seems to me, is Mobil's concern about Saudi preference shipping—a concern so profound that it led to the formation of·an entire dummy corporation. *It's impossible to believe that Tavoulareas alone could put together such a scheme for the sake of his son's business career, or that he would want to.*

Pls.' Exh. 542 (emphasis supplied).

Plaintiff contends that the underlined portion of the memorandum alone could serve as a proper evidentiary basis for the jury's finding of actual malice because one editor explicitly stated to another that the major premise of the article was "impossible to believe." He claims that this proves that *The Post* published the article despite the fact that one of its editors had substantial doubts about its accuracy.

The defendants have advanced a strained interpretation of the memorandum in an attempt to show that Ms. Peterson did not actually mean that she found the article impossible to believe. On this motion for judgment n.o.v., however, the Court must examine all the evidence in the light most favorable to the plaintiff, and, therefore, defendants' version must be rejected. Nevertheless, no matter how this memorandum is construed, it does not prove that *The Post* acted with actual malice.

■ Ms. Peterson was a copy editor and her primary responsibility was to fine tune the article grammatically *after* its substance had been examined by other editors. There is no evidence whatsoever to show that Ms. Peterson had any "inside" information about Tyler's sources or research that would enable her to know, or even

suspect, that the story was inaccurate. She was merely expressing her uninformed opinion that she found the story hard to believe.

If Ms. Peterson had investigated the article's substance and sources and thereafter had expressed a similar statement of doubt as to the article's veracity, plaintiff's argument might prevail. Plaintiff, however, has offered no evidence to this effect. The actual malice test focuses on the state of mind of the author and publisher of the allegedly libelous statements. Ms. Peterson's memorandum does not show that those who were responsible for the article's substance entertained any doubts whatsoever about its accuracy.

### B. *The Reliability of George Comnas and Philip Piro as Sources*

One method of proving that a libel defendant acted with actual malice is to show that he had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326. *See also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 169–70, 87 S.Ct. 1975, 1998–99, 18 L.Ed.2d 1094 (Warren, C.J., concurring in the result) and 172 (Brennan, J., dissenting) (1967); *Carey v. Hume*, 492 F.2d 631, 637 (D.C.Cir.), *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). Plaintiff claims that George Comnas and Philip Piro (two of Tyler's sources for the article) were so untrustworthy that reliance upon their statements was reckless and justified the jury's finding of actual malice.

#### 1. *George Comnas*

■ George Comnas is a highly experienced Greek shipping executive who was one of the founders of Atlas in 1974. In 1975, he resigned from this position for reasons that are in dispute. As part of his attempt to show that defendants knew Comnas to be an unreliable source, plaintiff cites several alleged inconsistencies between what Comnas told Tyler and what Tyler

knew to be the truth from other sources. Even if these inconsistencies existed, they are not sufficient to raise a jury question of actual malice. Simply stated, as a matter of law, reliance upon George Comnas as a primary source does not come close to approaching the level of recklessness required by the Supreme Court.

In *St. Amant v. Thompson,* the Supreme Court noted that actual malice and reckless disregard are terms that can only be defined on a case by case basis. 390 U.S. at 730–31, 88 S.Ct. at 1325–26. The Court did, however, present certain examples of reportorial behavior that might constitute actual malice:

> Professions of good faith [on the part of the publisher] will be unlikely to prove persuasive, for example, *where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.* Nor will they be likely to prevail when the publisher's allegations are *so inherently improbable that only a reckless man would have put them in circulation.*

*Id.* at 732, 88 S.Ct. at 1326 (emphasis supplied). While these hypotheticals of actual malice are certainly not exhaustive, their extreme nature serves to illustrate the enormous burden that a public figure plaintiff must overcome before he can prevail in a case such as this. He cannot merely point to a few inconsistencies in a source's statements and claim that he has proved the existence of actual malice.

In *Washington Post Co. v. Keogh,* 365 F.2d 965 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), a New York congressman sued *The Post* for publishing an allegedly libelous article written by a syndicated columnist. Plaintiff claimed that the columnist's reputation for veracity was so poor that the newspaper's reliance upon his word without conducting an independent investigation of his sources constituted reckless disregard.[10] The Court rejected this argument on the ground that the affidavits presented in support of plaintiff's position merely showed that the columnist "had made erroneous statements on a very few prior occasions" and that he had a controversial reputation.[11] *Id.* at 971.

In this case, much of Comnas' information was independently verified by other sources whose credibility even the plaintiff does not now challenge. Comnas was the former president of Esso Mediterranean and Esso Africa and he obviously had a substantial business career and reputation that could be damaged if he lied. Tyler had discovered many unsolicited laudatory comments made about Comnas by Paul Wolfe (Mobil Executive Vice President), Kousi, and William Tavoulareas himself. In addition, Comnas provided virtually the same information to Tyler as he gave to investigators for the House Subcommittee on Energy and Power.

Plaintiff also claims that defendants should not have relied upon Comnas' statements because they knew that Comnas had left Atlas after being accused of certain improprieties and, therefore, might have a motive to lie about the circumstances surrounding his departure. It is true that Dr. Piro told Tyler that Comnas left the company because he "was caught in some fraud." Kousi told Tyler, however, that he knew of no such accusations and when plaintiff testified before the SEC in 1977, he did not discuss any of these improprieties when set-

---

**10.** The facts of the instant case are somewhat different from those in *Keogh.* In *Keogh,* the Court was very concerned with the burden that would be imposed on newspapers if they were required to check the sources of all syndicated news reports and columns. 365 F.2d at 972. Because Tyler is a staff reporter for *The Post,* this concern would not appear to be so acute.

**11.** The court noted that a publisher would have "reason to suspect a publication's accuracy where he knows or should know that the author or endorser is persistently inaccurate." 365 F.2d at 971.

ting forth the reasons for Comnas' departure. Kousi and Tavoulareas stated that Comnas left Atlas because he was not handling the business in a satisfactory fashion. Thus, it is not at all clear that Comnas left Atlas under circumstances that should have aroused Tyler's suspicions as to his motivation for speaking unfavorably about the plaintiff.[12]

Even if Comnas harbored some animosity towards Mobil or the Tavoulareases as a result of the circumstances under which he left Atlas, Tyler would not necessarily be precluded from reporting his statements. In *Garrison v. Louisiana,* the Supreme Court emphasized that even if an individual is motivated to speak out of hatred, so long as the statement is honestly believed to be true, he makes a contribution to society's free interchange of ideas. The actual malice test penalizes only the "calculated falsehood." 379 U.S. at 73–75, 85 S.Ct. at 215–216.

### 2. *Philip Piro*

■ At the time Sandy Golden introduced Philip Piro to Tyler, Piro was in the midst of a less than amicable divorce proceeding with plaintiff's daughter. He was openly hostile to the Tavoulareas family and undoubtedly harbored a considerable amount of ill will towards them. In addition, Tyler testified that he was very skeptical about Piro's reliability because much of the information he supplied was inaccurate.

The fact that Dr. Piro may have been an unreliable informant is irrelevant, however, because he was not a primary, or even a secondary, source for the November 30 article. He may have been the person who rekindled *The Post*'s interest in the Atlas story but, because of Tyler's skepticism, *The Post* relied on other sources as authority for many of Piro's remarks. In addition,

Tyler ignored much of the information Piro supplied to him.

### C.  *Defendants' Disregard of Certain Information Available to Them*

■ Plaintiff claims that at trial he presented substantial evidence upon which the jury could reasonably find not only that the defendants recklessly disregarded the truth but that they *deliberately* ignored it every time it stood in their path. In support of this contention, he cites certain information that was available to the defendants that they did not include in the November 30 article. Defendants claim that this information is irrelevant to the question of actual malice because they can only be held accountable for the information that they actually printed and not for items that were omitted and which, if included, may have made the article more balanced. Of course, this statement of the law is only partially correct. Obviously, if the defendants possessed information that showed that some of the article was incorrect, ignoring it would constitute actual malice.

The information that plaintiff claims the article should have contained falls far short of proving, however, that the story included knowing lies or reckless untruths. The most that can be said about this information is that its absence caused the article to be "shaded" against Mobil's position. In submissions subsequent to oral argument, the parties addressed the issue of whether "selective" or "slanted" reporting could constitute actual malice. Plaintiff relied heavily on a case decided by the United States Court of Appeals for the Fifth Circuit, *Rebozo v. Washington Post Co.,* 637 F.2d 375, *cert. denied,* 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981), which appears to hold that actual malice can be proved if the plaintiff shows that the publisher resolved

---

**12.** Tyler was fully aware of the allegations of Mobil's and/or Samarco's dissatisfaction with Comnas' business prowess. This, however, would not appear to reflect poorly on his credibility as a source. As defendants contend, "[a] man's ability to run a business is simply not pertinent to whether 'there are obvious reasons to doubt the veracity' of information he supplies concerning events that he personally witnesses." Defendants' Reply Memorandum at 17.

ambiguities in source material in favor of the most potentially damaging alternative. *Id.* at 382.

That holding, however, is arguably inconsistent with the Supreme Court's opinion in *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).[13] In that case, the United States Commission on Civil Rights prepared a report that discussed some of the allegations contained in a complaint filed against a group of Chicago police officers. *Time* magazine admitted that it knew that the accusations in the summary were merely allegations yet it reported them as findings of the Commission. In reversing the Court of Appeals, the Supreme Court held that the "omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations" of an ambiguous document and this "was not enough to create a jury issue of 'malice' under *New York Times.*" *Id.* at 290, 91 S.Ct. at 639. Thus, the Court found no actual malice despite the fact that certain crucial information was omitted from the article. In the absence of any further guidance on the issue from this Circuit or the Supreme Court, this Court is not prepared to consider saving the verdict in this case on the basis of the holding in *Rebozo.*[14]

The issue in this case is, therefore, not whether the article was partisan, narrow or one-sided. The only issue before the Court is whether "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325. As the Supreme Court stated in another context in *Miami Herald Publishing Co. v. Tornillo:*

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper ... and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.

418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974). Plaintiff supplied the Court with six separate examples of material that the defendants disregarded. Several of these will be addressed below.

Before *The Post* published the article, Tyler interviewed Lewis Lapham, one of Mobil's outside directors. He told Tyler that the Mobil board of directors consistently reviewed the relationship between Mobil and Atlas and that the board was completely satisfied with all aspects of it. He also told Tyler that he did not believe that plaintiff played a personal role in Atlas and that at key board meetings plaintiff would leave the room to facilitate the opportunity for more open discussion of the subject. Plaintiff claims that the jury was entitled to find actual malice because Lapham's quotes were included in an earlier draft of the article but removed from the draft that *The Post* ultimately published.

Despite the fact that the November 30 article did not contain this exact information, it did include at least three paragraphs that conveyed almost everything that Lapham had said. For example, paragraphs 13, 19 and 25 of the article stated that:

> The Mobil board of directors was told from the outset about the Atlas arrangement but was assured that company president Tavoulareas was not involved in his son's venture in any way....

> Mobil Chairman Warner says he assured directors in board meetings that Tavoulareas "does not participate in any decisions" relating to Mobil's business with Atlas.

> The elder Tavoulareas ... stated that he divorced himself from Mobil's business

---

13. *See also, Ryan v. Brooks,* 634 F.2d 726, 733 (4th Cir.1980); *Simmons Ford, Inc. v. Consumer's Union,* 516 F.Supp. 742, 749–50 (S.D.N.Y. 1981); *Hutchinson v. Proxmire,* 431 F.Supp. 1311, 1329 (W.D.Wis.1977), *aff'd,* 579 F.2d 1027 (7th Cir.1978), *rev'd on other grounds,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

14. It should be noted that the November 30 article did contain well over twenty separate paragraphs that set forth Mobil's position on the matter.

with Atlas after his son joined the company.

Thus, the fact that Tyler ignored Lapham's comments may indeed demonstrate that he attempted to understate Mobil's position but it does not show that he acted in reckless disregard of the truth.[15]

Plaintiff also objects that the defendants made no mention whatsoever of the fact that Atlas was an efficient management firm or that Mobil received economic benefits from the relationship. Undisputably, there was much evidence in the record that showed that Mobil profited significantly from this relationship and that Atlas was not merely a fly-by-night organization set up solely for Peter's benefit. These facts, however, are legally immaterial to a finding of actual malice. Presumably, plaintiff would prefer that the article mention the beneficial effects of the arrangement. However, he cannot force *The Post* to include facts that he believes to be important. *See Miami Herald Publishing Co. v. Tornillo,* 418 U.S. at 258, 94 S.Ct. at 2839.

The November 30 article simply did not relate whether the establishment of Atlas was a good or bad business decision. It explicitly stated that Atlas and Samarco were formed in response to Mobil's anticipation of the enactment of Saudi preference shipping laws. It then proceeded to discuss the actions Mobil undertook in response to these fears. If the article had contained a description of Atlas' beneficial economic effects, it may have been more balanced, but the fact that such a description was not included does not mean that the defendants acted with actual malice.

### D. *The Language and Innuendo of the Article*

A thorough examination of the plain language of the article, the innuendoes that could reasonably be derived therefrom, and the thrust of the article as a whole reveals that no part of it was published with actual malice as that term is understood in the law of libel. At trial, much of the testimony revolved around the article's first paragraph which stated that plaintiff "set up his son . . . as a partner in a London-based shipping management firm." Even this statement, presumably one of the most offensive in the article, was not published with actual malice. Plaintiff's own 1977 SEC testimony provided Tyler with a sufficient basis for this allegation. During that testimony, plaintiff stated that he knew in early 1974 that Comnas and his son were seriously discussing the possibility of going into business together. When Samarco became a viable option a few months later, plaintiff testified that he met personally with Comnas in order to recruit him to run the management arm of the business. Tyler also had Comnas' statements that plaintiff had personally recruited him and that plaintiff had requested that Peter be brought into Atlas. In addition, Kousi had referred to Peter's employment as a nepotistic act.

Based on all this information, Tyler wrote that William had "set up" Peter in Atlas. This may not be the most felicitous choice of vocabulary that could have been used to describe the situation but, given the material that formed the basis for this statement, it cannot be said that it was a lie or a reckless untruth. Defendants correctly point out that while plaintiff may contest the ultimate truth of some of this information, he does not dispute the fact that Tyler had this material in his possession at the time he wrote the story. Most importantly, as discussed in part III(B) above, he was entitled to rely upon the information his sources provided.

---

15. These paragraphs of the article also essentially summarize the contents of two 1974 Mobil memoranda that *The Post* had in its possession. Paul Wolfe, Mobil Executive Vice-President, wrote one of the memos and in it he instructed all Mobil personnel dealing with Samarco to be sure that all business was conducted at "arm's length." Plaintiff wrote the other memo himself, directing Wolfe to bypass him on all Samarco matters in favor of Mobil Chairman Rawleigh Warner.

Plaintiff also contends that the article goes far beyond simply stating that he "set up" his son in a lucrative business. Because the implications or innuendoes that the article conveys may also be libelous, the defendants cannot escape liability merely by asserting that the literal language of the article was not published with actual malice. It is up to the Court, however, to decide whether the meaning claimed by the plaintiff can reasonably be inferred from the article's language. Plaintiff cannot add a defamatory meaning to the article by construing it in the most damaging light possible unless there is a basis to support this interpretation. *See* W. Prosser, *Law of Torts* § 111, at 749 (4th ed. 1971); L. Eldredge, *The Law of Defamation* at 44–45 (1978). In this case, plaintiff reads certain implications into the article's text that, as a matter of law, are unreasonable.

A prime example of this can be found by examining one of the statements made at the December 15, 1982 hearing on these post-trial motions by counsel for plaintiff, Mr. Walsh. He argued that:

> The article said that Tavoulareas was the driving force, that he set the whole thing up, that he conceived this. And certainly a reasonable [sic] could take—it was simply more than just following it up. Right from the headline, Mobil chief sets up son in venture, and through those all important lead paragraphs, the theme was that William Tavoulareas had done this and the [sic] he didn't have any particular business justification . . . .

Judgment n.o.v. Transcript at 78. The article cannot reasonably be interpreted to convey this meaning because it did not say that William Tavoulareas put together the Mobil-Atlas-Samarco arrangement solely for

the sake of his son.[16] As mentioned above, the article specifically stated (in paragraphs 40–41) that Samarco and Atlas were created for certain political and economic reasons. The nepotism discussed in the article clearly had its origin in a legitimate business opportunity.

Plaintiff also erroneously contends that the November 30 article impliedly accused him of misusing Mobil's assets, misleading the SEC, and failing to report his activities with Atlas to Mobil's shareholders, officers, and directors. This might conceivably be an accurate description of the December 1 article but not of the November 30 story— the one that the jury found the defendants liable for publishing.

In addition, the defendants have attempted to explain and support five particular innuendoes they believe plaintiff contends the article contained.[17] Most of these statements were incorrectly labeled as innuendoes by the defendants because they are explicitly stated in, rather than implied by, the article. Nevertheless, how they are classified is irrelevant because there is no evidence in the record that proves that any of them were published with actual malice. For example, paragraph 21 of the article states that:

> Tavoulareas personally recruited two shipping executives, one an outside consultant and the other a Mobil vice president, for Atlas.

Plaintiff claims that defendants published this statement knowing it was false. The basis for part of this statement, however, is plaintiff's testimony before the SEC in 1977 in which he stated that he recruited George Comnas to head Atlas. In addition, it is undisputed that Mobil made Harmon

16. More specifically, the story does not say that plaintiff "set up" Atlas for his son. Rather, it states that he "set up" his son in Atlas. On its face, this distinction may appear to be minor but, in reality, it is critical to a proper reading of the article.

17. The five "innuendoes" defendants identify are that, (1) plaintiff recruited shipping execu-

tives for his son's company, (2) plaintiff negotiated the contract between Samarco and Atlas, (3) plaintiff urged that his son be included as a partner in Atlas, (4) plaintiff forced out Comnas to permit Peter to gain control of the company, and (5) plaintiff misled Mobil and the SEC and refused to be interviewed by *The Post*.

Hoffmann, the president of Mobil Shipping and Transportation Company, available as an interim manager of Atlas to fill the void created in the company by Comnas' departure. Plaintiff apparently participated to some extent in the discussions that led to Hoffmann's temporary assignment at Atlas. Tyler also made a note of a conversation he had with Mobil Vice President Everett Checket that confirmed that plaintiff had stated that he had sent Hoffmann to Atlas.[18] These undisputed factors alone negate any possible inference of actual malice.

## IV. Conclusion

As discussed above, on this motion for judgment n.o.v., the evidence adduced at trial must be construed in the light most favorable to the plaintiff. With this in mind, the Court has thoroughly reviewed the massive record in this case and has concluded that there is no evidence to support the jury's verdict. No matter how the Christine Peterson memorandum is construed, it does not show that anyone responsible for the substance of the article knew that it was false. Even if the Court accepts every inconsistency plaintiff claims existed in George Comnas' statements, reliance upon him by the defendants was not reckless. Similarly, even if the defendants possessed all the information plaintiff contends that they disregarded, a careful examination of this material in the light most favorable to the plaintiff reveals that *none* of it proves that the article contained lies or reckless untruths. In the absence of "actual malice," the judgment rendered against the defendants must be set aside.

> Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive.

*New York Times Co. v. Sullivan,* 376 U.S. at 278, 84 S.Ct. at 725. An order granting

defendants' motions for judgment n.o.v. accompanies this memorandum.

## ORDER

Upon consideration of the alternative motions for judgment *non obstante veredicto* (n.o.v.), for a new trial, or for reduction in the amount of the judgment filed by defendants The Washington Post Company, Patrick E. Tyler and Sandy Golden, the memoranda and supplemental memoranda of points and authorities in support thereof and in opposition thereto, the arguments of counsel in open court, the entire record herein, and for the reasons stated in the accompanying memorandum, it is by the Court this 2nd day of May, 1983,

ORDERED that defendants' motions for judgment n.o.v. be, and hereby are, granted; and it is further

ORDERED that the judgment entered in this action on August 3, 1982 in favor of plaintiff William Tavoulareas and against defendants The Washington Post Company, Patrick E. Tyler, and Sandy Golden be, and hereby is, vacated; and it is further

ORDERED that judgment be, and hereby is, entered in favor of defendants The Washington Post Company, Patrick E. Tyler, and Sandy Golden and against plaintiff William Tavoulareas; and it is further

ORDERED that defendants' motions for new trial and for a decrease in the amount of the judgment be, and hereby are, denied without prejudice.

---

**18.** Checket denies that he gave such a statement to Tyler. Tyler may, therefore, have been negligent in transcribing Checket's statement but plaintiff introduced no evidence that would show that Tyler deliberately falsified this document.